927 P.2d 1045

Eileen M. MARTINEZ,
Plaintiff–Appellee,

v.

CITY OF GRANTS and Willie R. Alire, City Manager in his individual capacity, Defendants–Appellants.

No. 23521.

Supreme Court of New Mexico.

Nov. 22, 1996.

**509**

Gallagher, Casados & Mann, P.C., Gail Stewart, Albuquerque, for Defendants–Appellants.

Vernon W. Salvador and Kent Winchester, Albuquerque, for Plaintiff–Appellee.

OPINION

RANSOM, Justice.

1. Eileen Martinez (hereinafter "Martinez" or "Eileen") sued the City of Grants and, in his individual capacity, former city manager Willie Alire. She alleged that she had been terminated from her job as city clerk in violation of the New Mexico Human Rights Act, NMSA 1978, §§ 28–1–1 to –7, 28–1–9 to –14 (Repl.Pamp.1991 & Cum.Supp. 1995), and in violation of her rights to free speech under the United States and New Mexico Constitutions. At the close of Martinez's case Defendants moved for a directed verdict on the free-speech claims, arguing that Martinez had failed to present evidence that she had engaged in speech touching on a matter of public concern. They also moved for a directed verdict on Martinez's claim against Alire for punitive damages based on the violation of her rights to free speech. The trial court denied the motions, and Defendants proceeded with their case. At the close of all the evidence Defendants renewed their motions for directed verdict, which again were denied.

2. Prior to submission of this case to the jury, Martinez's free-speech claim under the New Mexico Constitution was withdrawn and her Human Rights Act claim against Alire was dismissed such that, when the case was submitted to the jury, two theories of recovery remained: a First Amendment free-speech claim against the City for compensatory damages and against Alire both for compensatory and punitive damages; and a Human Rights Act claim against the City for compensatory damages alone. The jury returned a verdict in favor of Martinez on all her claims and awarded compensatory damages of $146,016 against both Defendants and punitive damages of $151,635 against Alire. The trial court entered judgment accordingly, after which Defendants moved for judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur. The trial court denied these motions, and Defendants appealed to the Court of Appeals.

3. Because Martinez originated this case by filing a complaint with the Human Rights Division of the New Mexico Department of Labor pursuant to the New Mexico Human Rights Act, and because this Court has exclusive jurisdiction over appeals from district court orders and judgments involving that Act, § 28–1–13(C), the Court of Appeals transferred this case to us, see NMSA 1978, § 34–5–10 (Repl.Pamp.1990) (transfer of erroneously docketed appeals). Alire and the City (as Alire's indemnitor) seek reversal only of the award of punitive damages. We conclude that Martinez presented substantial evidence of protected speech. Nevertheless, because the instructions allowed the jury to consider items of unprotected speech as a basis upon which it could find for Martinez, we remand for a new trial on the issue of punitive damages.

4. *Facts and proceedings.* Martinez worked as city clerk for the City of Grants from August 1986 until she was terminated on March 9, 1993. Willie Alire worked as city manager beginning in August 1991 and directly supervised Martinez. The positions of city clerk and city manager are appointed positions created by state statute. NMSA 1978, § 3–12–4(A) (Repl.Pamp.1995) (providing that municipality shall create appointive office of clerk); NMSA 1978, § 3–13–3 (Repl. Pamp.1995) (providing that municipalities with populations of one thousand or more persons may create appointive position of manager). The basic duties of a city clerk include keeping custody of all minutes, ordinances, and resolutions; attending all meetings; recording all minutes, ordinances, and resolutions; and, upon request, furnishing copies of all municipal records. NMSA 1978, § 3–13–1(A) (Repl.Pamp.1995). The duties of a city manager include acting as chief administrative officer; enforcing and carrying out all ordinances, rules, and regulations; employing and discharging all administrative employees; preparing and submitting an annual budget; and making recommendations to the city council on matters concerning the municipality's welfare. NMSA 1978, § 3–14–14 (Repl.Pamp.1995).

5. Problems surfaced between Martinez and Alire almost immediately after Alire assumed the position of city manager. Martinez testified that prior to Alire's arrival she had developed good working relationships with other personnel in the city offices, including Roberta Martinez, the secretary to the city manager, and Paula Chavez, the city personnel manager, but that these relationships deteriorated soon after Alire's arrival. She also testified that Kathy Gallegos, a temporary employee directly supervised by Roberta Martinez, developed an "attitude problem" shortly after Alire's arrival insofar as Gallegos did not help Eileen when asked to do so.

6. The problems between Martinez and Alire began in earnest in October 1991. After returning from an international conference of clerks in Canada, Martinez noticed the formation of what she termed a clique, from which she felt excluded. When she discussed this with Alire he told her that everything had gone smoothly during her absence and that everyone had gotten along fine. Martinez understood this to mean that she must be the problem. Further, Alire told Martinez that Kathy Gallegos was "there to stay" when Martinez complained to him about her.

7. Martinez also testified that in late October or early November 1991 she received phone calls from three different persons inquiring about out-of-town business trips Alire had taken with Kathy Gallegos. These persons wanted to know why a temporary employee was making such important trips. Martinez testified that she did not indicate to any of these callers that something untoward was going on. Martinez reported these three calls to Alire who became very upset with her. Alire told Martinez the trips were none of her business and presented her with a memorandum which he instructed her to read to anyone inquiring about his business trips.

8. Martinez believes that by November or December 1991 Alire hated her. As evidence of this hatred Martinez cited several incidents occurring at that time. For example, her November 9 calendar entry reads "Willie accused me of leaking information to [news reporter] Charlotte Fellers—not true." Her December 9 calendar entry reads "Willie ac-

cused me of rumors I did not even know about."[1] Finally, at the 1991 Christmas party Alire gave Kathy Gallegos and Roberta Martinez "beautiful" necklaces while he gave Eileen and other employees in the city offices bottles of wine. Martinez believed that Alire gave preferential treatment to all women in the office with the exception of her. For example, Kathy Gallegos was allowed to use a city vehicle and to arrive on the job late and leave early. Roberta Martinez was given a $9000 raise allegedly because she dressed "less conservatively" than Eileen.

9. The incident which Martinez believes irreparably damaged any working relationship she may have had with Alire, and to which she attributes Alire's retaliatory harassment and her eventual termination, occurred in January 1992. Martinez testified that on January 23 she entered Alire's office quickly after knocking on the door. She alleges that she witnessed Alire and Kathy Gallegos preparing to kiss, which conclusion she drew from their closeness and her observation that Gallegos had her arms around Alire. Martinez also testified that although she was surprised by what she had just seen she did not at that time tell anyone about it other than her husband and her priest.

10. As evidence of Alire's retaliatory harassment following the January 23 incident, Martinez introduced several memoranda addressed to her from Alire. Further examples of harassment cited by Martinez included asking her to do unorthodox things, such as changing minutes that had already been approved; calling her "a little shit"; throwing papers at her; and accusing her of withholding a check from the fire department. Alire also allegedly made fun of her lipstick and described her to others in the office as "the mushroom in the dark." Finally, during a disagreement over proposed changes to Martinez's job description, Alire allegedly twice poked Martinez in the collarbone.

11. In addition to protesting Alire's preferential treatment of Kathy Gallegos to Alire himself, Martinez protested his favoritism to the mayor, city council members, an EEOC investigator, and an investigator hired by the city to resolve some of the problems related to Alire and the executive department. In a memorandum on personnel matters issued by the mayor on September 10, 1992, the mayor set forth that he and the council had come to certain decisions and recommendations, including the following general reference to Martinez's protests of favoritism: "The City Clerk will apologize to the City Manager and to his secretary, Kathy Gallegos, in writing for communicating gossip alleging a relationship between the manager and his secretary."

12. In his notice of termination, Alire listed six numbered reasons for terminating Martinez on March 9, 1993. Alire testified that his first reason, "fomenting discontent," was meant, in part, to refer to the fact Martinez talked to other people about his favoritism. He stated that he resented her going to the mayor and council about favoritism, among many other things. Another reason for terminating Martinez, "making false statements and false accusations," referred to Martinez's complaints to the mayor and council about preferential treatment. "Making continued threats at exposing the City Manager through [photographs which are compromising and tape recordings which are compromising]," involved Martinez telling about the relationship between Alire and Kathy Gallegos, and its effects in the office, to an EEOC investigator and another investigator for the mayor and council.

13. *Preservation and standard of review.* In their motion for a directed verdict at the close of Martinez's case, Defendants argued that Martinez had not presented substantial evidence of speech touching on a matter of public concern. The court considered argument about whether an exercise by Martinez of her right to speak on a matter of public

---

**1.** When Alire interviewed for the position of city manager he perceived that a primary problem under previous city managers had been the lack of a definite chain of command and that the mayor and city council wished the new city manager to correct this problem. Among the prob- lems Alire observed was that Martinez and many department heads had developed a practice of airing grievances directly to the mayor or members of the council. Alire announced to the various department heads his intention to change this practice.

concern was demonstrated by evidence that she had reported Alire's alleged conduct with Kathy Gallegos to city council members, evidence that she had complained about Alire's retribution for speaking out about his alleged conduct with Gallegos, and claims that she had been unlawfully terminated for filing this lawsuit, filing a claim with the New Mexico Human Rights Commission and making other protestations against favoritism based on sex, and reporting citizen complaints. The trial court agreed that the filing of this lawsuit was not protected speech because Martinez's termination preceded the filing. The court nevertheless denied the motion because it concluded Martinez had presented sufficient evidence of speech addressing preferential treatment based on sexual favoritism, which the court considered a matter of public concern. The court did not express an opinion whether Martinez's allegation that she had been terminated for reporting citizen complaints touched upon a matter of public concern.

■■■ 14. On appeal, Defendants again challenge the sufficiency of the evidence introduced by Martinez to support her claim that she was unlawfully terminated for exercising her First Amendment rights. Because Defendants proceeded with their case after the trial court denied their motion for directed verdict, they waived any objection they might have had to the sufficiency of the evidence at the close of Martinez's case. *In re Estate of Strozzi (Barber v. Pound),* 120 N.M. 541, 544, 903 P.2d 852, 855 (Ct.App.), *cert. denied,* 120 N.M. 498, 903 P.2d 240 (1995). Nevertheless, Defendants objected to the court's instruction on Martinez's free-speech claim, arguing that none of the evidence of speech identified for the jury by the court establishes a matter of legally adequate public concern under applicable Tenth Circuit and Supreme Court precedent. Also, Defendants made a motion for directed verdict at the close of all the evidence and for judgment notwithstanding the verdict. Thus, they have preserved their objection to the sufficiency of the evidence to support the jury's verdict. *See Romero v. Mervyn's,* 109 N.M. 249, 253 n. 2, 784 P.2d 992, 996 n. 2 (1989) (noting that sufficiency of evidence may be raised on appeal if error was brought

to court's attention by objection to instructions or motions for directed verdict or j.n.o.v.). A challenge to the sufficiency of the evidence supporting a claim that an employee was terminated for exercising First Amendment rights involves threshold questions of law which this Court reviews de novo. *See Connick v. Myers,* 461 U.S. 138, 148 n. 7, 150 & n. 10, 103 S.Ct. 1684, 1691 n. 7, 1692 & n. 10, 75 L.Ed.2d 708 (1983); *Powell v. Gallentine,* 992 F.2d 1088, 1090–91 (10th Cir.1993).

■ 15. *Law applicable to employee First Amendment unlawful discharge claims.* It is well established that a government employer may not discharge an employee for reasons that infringe his or her free-speech interests. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972) (citing line of decisions striking down government actions that denied benefits on bases that infringed constitutionally protected interests); *Carrillo v. Rostro,* 114 N.M. 607, 620, 845 P.2d 130, 143 (1992) ("We . . . take it as settled, in New Mexico and throughout the nation, that a public employee . . . has the right to speak on a matter of public concern."); *Gomez v. Board of Educ.,* 85 N.M. 708, 712–14, 516 P.2d 679, 683–85 (1973) (applying *Perry* rationale to suit by bus driver alleging his contract was not renewed because he had instituted legal action against school board). Chronologically, we consider several cases important to our resolution of this appeal.

16. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the United States Supreme Court considered whether an Illinois board of education could, consistent with the Constitution, terminate a teacher for sending to a local newspaper a letter critical of the manner in which the board and district superintendent of schools had handled a 1961 bond issue proposal and the subsequent allocation of resources between educational and athletic programs. The Court stated that public employees do not relinquish their interest in commenting on matters of public concern simply by virtue of having accepted government employment. *Id.* at 568, 88 S.Ct. at 1734. The Court nevertheless cautioned that

the government has an interest in regulating the speech of its employees that "differ[s] significantly from [that which] it possesses in connection with regulation of the speech of the citizenry in general." *Id.* Because of the tension between the employee and employer interests the Court concluded that "[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

17. In *Perry* the Court considered whether a Texas junior college professor could be terminated for testifying before committees of the state legislature about his belief that the college at which he worked should be elevated to four-year status. In addition to this testimony, an advertisement critical of the college's board and attributed to the professor appeared in a local newspaper. The professor's position was at odds with that adopted by the college's board of regents. After noting that the professor's lack of a contractual or tenure-based right to re-employment did not bar his free-speech claims, the Court concluded that the professor's allegation that he had not been retained because of "his testimony before legislative committees and his other public statements critical of the Regents' policies ... present[s] a bona fide constitutional claim." 408 U.S. at 598, 92 S.Ct. at 2698.

18. Similarly, in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court considered a constitutional claim for the unlawful termination of a teacher who alleged that he had not been rehired because he relayed to a radio station a confidential memorandum relating to teachers' dress and appearance. The Court accepted the lower court's determination that the teacher's conduct in making the memorandum public was constitutionally protected. The Court ultimately vacated an award in favor of the teacher, however, because the judge had not determined whether the board had established by a preponderance of the evidence that it would have made the negative employment decision even in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576. *See also Givhan v. Western Line Consol.Sch.Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (holding that First Amendment protects employee from being terminated for voicing concerns in private about school district's allegedly racially discriminatory policies); *Jacobs v. Stratton,* 94 N.M. 665, 667, 615 P.2d 982, 984 (1980) (*Jacobs I*) (holding nontenured professor stated cause of action if he alleged he was terminated for exercising First Amendment rights and remanding for further proceedings because jury not instructed that it must balance interest of employee as citizen in commenting on matters of public concern against interest of employer in promoting efficiency of the services it performs).[2]

19. In *Connick* the United States Supreme Court considered "whether the First and Fourteenth Amendments prevent the discharge of a state employee for circulating a questionnaire concerning internal office affairs." 461 U.S. at 140, 103 S.Ct. at 1686. The Court explained that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 S.Ct. at 1689. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690–91; *see also Jacobs v. Meister,* 108 N.M. 488, 491–92, 775 P.2d 254, 257–58 (Ct.App.) (*Jacobs II*) (holding that nontenured professor's public statements critical of university administration were of public concern and protected under *Pickering* balance despite evidence that statements disrupted university activities and

---

**2.** As we explained in *Carrillo,* 114 N.M. at 623 n. 16, 845 P.2d at 146 n. 16, "[a]lthough this Court in *Jacobs I* stated that the jury must be given an instruction on the *Pickering* balancing test, we note the apparent consensus in the federal courts that the balancing process is an inquiry of law for the court, not a factual issue for the jury."

affected teacher's relationships with his superiors), *cert. denied*, 108 N.M. 582, 775 P.2d 1299 (1989).

20. From *Connick* and its antecedents there is a four-part test to determine whether an employee has been unlawfully terminated for exercising his or her free-speech rights. First, it must be determined that the employee exercised the right to speak upon a matter of public concern. Then, if it is determined that the employee has so exercised his or her right to speak, it must be determined whether the employer's interest in the efficient performance of its assigned tasks outweighs the employee's free-speech interest. Determination of each of these issues is a question of law to be decided by the court prior to submission to the jury. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1691 n. 7. Once it is established that the employee has a protected interest in speaking that is not outweighed by the employer's interest in the efficient performance of its assigned tasks, then there are two factual issues for the jury. The employee must prove that the protected speech was a substantial or motivating factor in the employment decision. The burden then shifts to the employer to establish that the negative employment decision would have been made despite the protected speech.

21. *Speech on which the jury was instructed.* A proper instruction limits jury consideration to the specific issues to be determined and does not permit the jury to base its decision on a legally incorrect ground or to speculate about the permissible bases for recovery. In *State v. Olguin*, 120 N.M. 740, 741, 906 P.2d 731, 732 (1995), we reaffirmed in the criminal context the principle that a conviction under a general verdict must be reversed if one of the alternative bases for conviction is legally inadequate.

22. In *Ewers v. Board of County Commissioners of Curry County*, 802 F.2d 1242, 1246 (10th Cir.1986), the Tenth Circuit held that a trial court improperly instructed the jury on an employee's First Amendment wrongful-discharge claim because the instruction "failed to set forth the exact speech at issue." The court reasoned that under *Mt. Healthy* the issue is whether the employee has established that his or her protected speech was a motivating factor in the detrimental employment decision, and therefore the protected speech must be specifically identified to permit the jury to reach an intelligent and legally correct determination. *Ewers*, 802 F.2d at 1246–47.

23. Here, the trial court instructed the jury as follows on Martinez's First Amendment claim:

> [Martinez] claims that while the Defendants were acting under color of authority of the City of Grants ... they intentionally violated [her] constitutional rights by [1] retaliating against her for reporting citizens' complaints, [2] her own complaints, and then [3] resisting and complaining about the harassment which resulted from Alire's conduct, including [4] the filing of a charge with the New Mexico Human Rights Commission and [5] this lawsuit.
>
> . . . .
>
> In order to prove that her speech activities were a "substantial or motivating" factor in the Defendants' decision, the Plaintiff does not have to prove that [any one or all of] the [five] protected speech activities were the only reason the Defendants acted against her. It is sufficient if the Plaintiff proves that [any of the five] protected speech activities were a substantial consideration that made a difference in the Defendants' decision.

Defendants argue that a proper instruction would have specifically identified for the jury the items of speech that the court had determined are protected and that this instruction gave the jury carte blanche to determine that every dispute or disagreement which arose between Martinez and Alire involved constitutionally protected speech for which Martinez could not lawfully be terminated. Further, Defendants contend that Martinez introduced no evidence of protected-speech activity (involving matters of public concern); all of her evidence involved activities for which she could be terminated without violating her constitutional rights to free speech.

24. The court identified for the jury five matters of public concern upon which Martinez had exercised the right to

speak: reporting citizen complaints, voicing her own complaints, complaining about harassment, filing a charge with the New Mexico Human Rights Commission, and filing this lawsuit. Whether each category of speech addresses a matter of public concern is a question to be answered from "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. Further, we must consider Martinez's subjective intent at the time the statements in question were made; the fact that a particular statement was made in the context of an ongoing personnel dispute, while not entirely dispositive, suggests that the speech does not involve a matter of public concern.

25. "Citizens' complaints" refer to the three phone calls Martinez testified she received in November and December 1994. Martinez's testimony regarding these calls simply recounted that she had received them, that the callers each had inquired why Alire would be taking a temporary employee, Kathy Gallegos, on out-of-town business trips, and that Martinez had reported receiving these calls to Alire. There was no further testimony illuminating the substance of these calls, nor was there testimony which related these calls to an ongoing public debate over the qualifications of those holding city positions or to specific allegations by Martinez against Alire of corruption in office. In short, nothing about the "content, form, and context of [this] statement, as revealed by the whole record," *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690, suggests that "reporting citizen complaints" related to a matter of political, social, or other public concern.

26. Likewise, the category "her own complaints" is too broad to have allowed the jury to reach an informed and legally correct determination as to whether Martinez was terminated in violation of her First Amendment right to speak. In particular, under this instruction the jury could have determined that Martinez was terminated for complaining about having her office moved, changes in her job description, general working relationships in the office, and the gift she received at the office Christmas party. These particular complaints do not as a matter of law raise issues of public concern, and therefore the jury should not have been permitted to consider them as a basis upon which to award Martinez damages. The evidence identified by the court as complaints that the jury could find to have motivated Martinez's termination must have been the legally adequate matters of public concern that the court identified as speech addressing preferential treatment based on sexual favoritism.

27. The charge filed with the New Mexico Human Rights Commission does touch upon these matters of public concern. In that complaint Martinez made allegations of sexual discrimination by Alire, and that she suffered abuse, threats, and continued harassment in retaliation for having reported Alire's actions to the city council. Both the New Mexico legislature and the United States Congress have expressly legislated against this type of conduct. *See* 42 U.S.C. § 2000e–2(a) (1994) (Title VII) (making it an unlawful discriminatory practice to discharge, promote, demote, or otherwise discriminate in the terms of employment any person on the basis of sex); NMSA 1978, § 28–1–7(A) (Cum.Supp.1995) (same). Through this legislation society has voiced its concern with and condemnation of sexual discrimination and favoritism in the workplace. As such, Martinez's allegation that she was terminated for filing a complaint alleging such sexual discrimination involved a matter of public concern.[3]

28. Defendants alternatively contend that even if we find Martinez presented

---

3. Defendants argue that because the Human Rights Commission took no action on the complaint, and because the trial court dismissed Alire from Martinez's Human Rights Act claim against her "employer", the jury should not have been allowed to consider evidence that Martinez voiced concerns over sexual harassment in the workplace. Resolution of Martinez's allegations of sexual harassment, however, is not determinative either of her claim that she was terminated for complaining about a matter of public concern or of her interest in voicing complaints about sexual harassment. An employee may not be discharged for making false allegations touching upon a matter of public concern so long as those allegations were not made either with knowledge of or in reckless disregard of their falsity. *Pickering*, 391 U.S. at 574, 88 S.Ct. at 1738.

substantial evidence that she engaged in protected speech, we should reverse the award of punitive damages because the City's interest in the efficient provision of public services outweighs Martinez's free-speech interests. Relevant considerations in such a *Pickering* balance include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with regular operation of the enterprise." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987).

29. The City had the burden in this case to produce evidence of an actual disruption in public services. *Carrillo,* 114 N.M. at 622, 845 P.2d at 145 (reversing summary judgment in favor of employer because there was no record evidence of adverse effects created by plaintiff's speech); *see also Schalk v. Gallemore,* 906 F.2d 491, 496 (10th Cir. 1990). Here, Martinez testified that it was difficult to get work done, and Alire testified that the disturbed office atmosphere caused by Martinez's complaints made accomplishing tasks difficult. One of Martinez's co-workers also testified that on occasion she had difficulty getting work done because of Martinez's complaints. Quoting from *Connick,* 461 U.S. at 153, 103 S.Ct. at 1693, Defendants argue that "[w]hen employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office."

30. In *Jacobs II* our Court of Appeals applied the *Pickering* balancing test in analyzing a professor's claims that a university decided not to renew his contract because he had made public statements critical of the university administration. The university argued that the professor's speech was not protected under *Connick* "because it undermined close working relationships and disrupted the proper functioning of the university." *Jacobs II,* 108 N.M. at 491, 775 P.2d at

257. The Court noted that "[e]ven if [the professor's] criticism ... disrupted university activities and affected his working relationships with his superiors and colleagues, the public interest in his comments could provide a first amendment protection to him." *Id.* at 492, 775 P.2d at 258. Ultimately, the Court concluded that the record supported the conclusion that the professor's speech was protected. *Id.*

31. We need not decide here the degree of deference that must be accorded to the employer when the terminated employee's speech addresses only matters of internal office policy. It would be disingenuous to equate complaints about a supervisor's preferential treatment of others in exchange for sexual favors with complaints about the supervisor's application of internal office policy. Martinez persuasively argues that speech touching upon matters of public concern critical of a supervisor or other members of an office will invariably cause some disruption and that the relevant inquiry in the *Pickering* balance is the degree of disruption in relation to the importance of the speech.

32. The importance of speech related to sexual harassment and discrimination is demonstrated by cases under Title VII of the 1964 Civil Rights Act (proscribing sexual discrimination apart from First Amendment protected-speech considerations). These cases clearly indicate the great repugnance that our society has for sexual harassment and discrimination in the workplace, as when a supervisor grants employment favors in exchange for sexual favors. *See, e.g., Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.,* 755 F.2d 599, 605–06 (7th Cir. 1985) (holding that the employer is strictly liable for acts of sexual harassment or discrimination by supervisory personnel); *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993) (same).

33. *Conclusion.* The trial court seemed to have properly analyzed the public-comment evidence when ruling on the motion for directed verdict at the close of the case in chief, but, over Defendants' objection, proceeded at the conclusion of the case to instruct the jury on claims that did not constitute comment on a matter of public concern.

Because Martinez did present substantial evidence of protected-speech activity, and because her interest in speaking out about alleged sexual harassment was not as a matter of law outweighed by the City's interest in the efficient provision of public services, the court did not err in presenting her First Amendment unlawful-termination claim to the jury. Nevertheless, because the court's instructions were overbroad and permitted the jury to consider matters not of public concern in reaching its decision, the award of punitive damages must be reversed. We remand this matter for a new trial on the issue of punitive damages. The trial court will decide the threshold issues of public concern and balance of interests based on the evidence adduced at trial, and, if appropriate, the case will be submitted to the factfinder in accordance with this opinion.

34. **IT IS SO ORDERED.**

FRANCHINI, MINZNER and McKINNON, JJ., and W. DANIEL SCHNEIDER, District Judge (sitting by designation), concur.