11 P.3d 550

2000-NMSC-029

Ana GONZALES, Plaintiff–Appellee
and Cross–Appellant,

v.

NEW MEXICO DEPARTMENT OF
HEALTH, Las Vegas Medical Center,
Defendant–Appellant and Cross–Appel-
lee.

No. 24,645.

Supreme Court of New Mexico.

Sept. 27, 2000.

Walter G. Lombardi, Louis N. Colon, Santa Fe, for Appellant and Cross–Appellee.

James A. Burke, Santa Fe, for Appellee and Cross–Appellant.

## OPINION

FRANCHINI, Justice.

{1} After a four-day trial, a jury found that Defendant Las Vegas Medical Center (LVMC) had retaliated against Plaintiff Ana Gonzales (Gonzales) after she pursued a discrimination claim under the New Mexico Human Rights Act, NMSA 1978, §§ 28–1–1 to –15 (1969, as amended through 1987, prior to 1991, 1993, 1995, and 2000 amendments). In 1990, Ana Gonzales brought a claim alleging that LVMC had discriminated against her because of her Hispanic national origin. *See* NMSA 1978, § 28–1–7(A) (1987, prior to 1995 amendment). In 1994, the New Mexico Human Rights Commission (HRC) concluded that Gonzales had failed to make a prima facie case of discrimination. Gonzales then appealed to the district court for a trial de novo under NMSA 1978, § 28–1–13(A) (1987). The jury determined that she had not been discriminated against but that she had suffered retaliation at the hands of LVMC. She was awarded damages and attorney's fees. LVMC filed an appeal directly to this Court under Section 28–1–13(C) of the Human Rights Act, and Gonzales filed a cross-appeal. We affirm the determinations of the trial court.

{2} On appeal, LVMC presents the following challenges to the proceedings below: (1) whether the trial court erred in refusing to dismiss Gonzales's retaliation claim; (2) whether the trial court erred in refusing to admit evidence about the changed structure of the crisis hotline in November 1995 and Gonzales's involvement with it; (3) whether the trial court erred in refusing to admit evidence of the HRC decision and order; (4) whether the trial court erred in refusing to admit evidence that Gonzales could have mitigated her damages by working on a different hotline; and (5) whether the trial court erred in refusing to instruct the jury on Gonzales's duty to mitigate damages.

{3} In the cross-appeal, Gonzales asks the Court to address the following issues: (1) whether the district court erred by failing to award stronger sanctions against LVMC for alleged abuses of discovery and destruction of evidence; (2) whether the trial court erred with respect to her discrimination claim by

(a) by refusing to instruct the jury on disparate impact, (b) declining to give an instruction based on a federal Equal Employment Opportunity Commission (EEOC) regulation relating to disparate impact, and (c) refusing to instruct the jury that a minority may discriminate against a person of the same ethnic background; and (3) whether the district court erred regarding attorney's fees in (a) reducing attorney's fees because Gonzales was only partially successful at trial, (b) failing to award attorney's fees for legal work done before the HRC, and (c) failing to award interest on the judgment and attorney's fees.

{4} Regarding LVMC's claims, we hold that the jury was reasonable in concluding that Gonzales was a victim of retaliation and affirm the trial court on this issue. We also affirm the trial court's ruling not to admit the evidence that LVMC claims should have been introduced to rebut Gonzales's claim of retaliation, as well as the court's decision to exclude evidence and jury instructions regarding the question of mitigation. As for the claims of Gonzales, we affirm the trial court's refusal to instruct the jury concerning disparate impact, discrimination against a minority by a minority, and the EEOC regulation relating to disparate impact. We affirm the trial court's determination that attorney's fees should not be awarded for those areas in which Gonzales did not prevail at trial or in the discrimination claim before the HRC. We also affirm the court's determinations not to assess interest on attorney's fees or the judgment and not to impose greater discovery sanctions against LVMC.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Crisis Hotline

{5} In the summer of 1989, LVMC was awarded a contract from the New Mexico Department of Health to provide outpatient mental health services to clients in San Miguel and Mora counties; the new program was called San Miguel/Mora Mental Health Services (SM/MMHS). The contract required LVMC to provide a twenty-four hour telephone crisis hotline for emergency situations.

{6} At that time the Hospital Administrator of LVMC was Pablo Hernandez, M.D., who had a practice of conducting monthly breakfast meetings to convey information to the entire LVMC staff. During a breakfast meeting in late summer or early fall of 1989, Dr. Hernandez described the contract for outpatient services and invited the staff to suggest program ideas for SM/MMHS. Gonzales, a Psychologist II at LVMC, did not attend this particular meeting.

{7} One person who did attend was Harold Pullings, also a Psychologist II. In response to Dr. Hernandez's request for ideas, Pullings thought of a telephone crisis hotline that he could manage on an on-call basis during his off-duty hours. Pullings was supervised by Thomas Sturm, Ph.D., Director of LVMC's Psychology Department. He described the idea to Dr. Sturm, who suggested Pullings submit a proposal to Dr. Hernandez. Dr. Sturm also recommended that at least one other person should work on the hotline in a backup capacity. Pullings approached another Psychologist II, Rudy Grano, who agreed to work with him. The crisis hotline idea was presented to Dr. Hernandez. After consulting with Dr. Sturm about the qualifications of Pullings and Grano, Dr. Hernandez approved the project without advertising for bids or notifying the rest of the Psychology Department staff. Pullings began working on the hotline in November of 1989, with Grano joining him a month later. Dr. Hernandez testified that the need to begin the program was urgent.

{8} On November 3, 1989, Gonzales learned that the management of the crisis hotline had been awarded to Pullings. A few days later, she complained to Dr. Sturm that she believed the award to Pullings was unfair. She testified that Dr. Sturm told her that, if Pullings approved, she could work on the hotline every other weekend in a backup capacity. She told him that she was not interested in such minimal participation; she believed she was qualified to assume Pullings' role as manager of the hotline. Gonzales wanted to have the same opportunity that Pullings had to submit a proposal for the operation of the crisis hotline. Dr. Sturm responded that he did not have the authority

to give her Pullings' job. He suggested that if she wanted that job, she would need to submit her own proposal to Dr. Hernandez for consideration.

{9} Dr. Hernandez testified that Gonzales never submitted any request or personally asked him if she could work on the hotline in any capacity. Gonzales testified that she would have submitted a written application for the crisis hotline if she had known that such an application would have afforded the same opportunity that was given to Pullings. She concluded that the matter had been decided with such finality that a submission would have been demeaning and futile. In a memorandum dated November 7, Gonzales expressed her interest in working on the community program in Las Vegas, stating that she "would appreciate hearing from [Dr. Sturm] about what is available and what [she needs] to do to qualify." However, Dr. Sturm testified that, to his knowledge, although the SM/MMHS contract was renewed annually, the position of manager of the crisis hotline was never opened for bids. In the fall of 1995, Gary Buff, Ph.D., who had succeeded Dr. Hernandez as Hospital Administrator, decided to reorganize the crisis hotline and sent a memorandum to all eligible clinicians, including Gonzales, soliciting their participation on the hotline.

## B. Complaint Before the HRC

{10} On February 16, 1990, Gonzales filed a charge of discrimination with the HRC. She alleged that LVMC discriminated against her on the basis of her Hispanic national origin in violation of Section 28–1–7(A) of the Human Rights Act when it failed to advertise or offer her the part-time position as manager of the crisis hotline. Gonzales's discrimination complaint was heard by the HRC in a three-day hearing in January 1994. The HRC issued its decision, findings of fact, and conclusions of law in August 1994. The HRC concluded that Gonzales had failed to make a prima facie case that her Hispanic national origin motivated LVMC's failure to announce formation of the crisis hotline or to offer her a position. The HRC found that LVMC did not have "the illegal discriminatory intent necessary to find

in favor of Gonzales." The HRC was, however, critical of LVMC's hiring practices, noting in particular "the cavalier attitude in which the Center was permitted to offer job opportunities without following any state selection process."

## C. Appeal to District Court

{11} Gonzales, on August 29, 1994, appealed the HRC's decision in district court, seeking a trial de novo as provided by Section 28–1–13(A). She alleged the following as the basis of her complaint: first, that LVMC discriminated against her, based upon her national origin, in November 1989 by selecting Pullings to work on a crisis hotline without "any rational selection process" in violation of Section 28–1–7(A) of the Human Rights Act; and second, that LVMC retaliated against her because she filed a complaint with the HRC in violation of Section 28–1–7(I)(2). On May 8, 1997, the jury returned a verdict partially in favor of each party. The jury determined that LVMC did not discriminate against Gonzales because of her national origin by not awarding her a position on the crisis hotline but found that LVMC did retaliate against her for filing a charge of discrimination with the HRC. The jury awarded $170,000 in damages on the retaliation claim.

{12} On May 22, 1997, the trial court entered a judgment for Gonzales for $170,000, plus costs and attorney's fees as provided by law. Gonzales then sought additional attorney's fees for the representation she received in the HRC hearing. She also moved to impose interest on the judgment, fees, and costs. The trial court received affidavits and held a hearing on the matter of attorney's fees. On August 28, 1997, the court awarded to Gonzales attorney's fees of $90,384 plus gross receipts tax and costs. The court declined to impose attorney's fees for either the discrimination claim at trial or for pursuing the HRC claim. The court did not impose interest on the judgment.

## II. DISCUSSION

### A. Discovery Sanctions

{13} Gonzales argues that the trial court abused its discretion by failing to

award stronger sanctions against LVMC for abuse of the discovery process and destruction of evidence. In March 1995, after LVMC had failed to respond in a timely manner to interrogatories, Gonzales filed a motion to compel production. *See* Rule 1–037(A) NMRA 2000. Following the failure of LVMC to supply all the requested information, the trial court granted the motion in July 1995. In August 1995, again citing LVMC's failure to provide discovery, Gonzales filed a motion for sanctions, including default judgment. *See* Rule 1–037(B). The court denied the request for default judgment but did order LVMC to compensate Gonzales's attorney for time spent on discovery in the amount of $1615. In February 1996, Gonzales filed another motion for default judgment, or, in the alternative, to limit defenses, alleging this time that LVMC had withheld evidence of the existence of another hotline operated by social workers at SM/MMHS. The court did not grant the motion but did award Gonzales costs and attorney's fees of $7968.75 for the motion and hearing.

{14} On December 4, 1996, Gonzales again filed a motion for default judgment or other sanctions alleging LVMC failed to comply with discovery and destroyed evidence. In November 1996, LVMC had informed Gonzales that neither Pullings nor his then supervisor, Dr. Gatling, maintained personal records of their work on the hotline. Pullings stated in a sworn affidavit that he used the notes to prepare monthly statistical reports and then discarded them after completing the reports. Gonzales argued that these notes were medical records that Pullings had a duty to preserve and that they were evidence critical to her case. Their destruction, she alleged, precluded her from learning what work Pullings, Dr. Sturm, and Dr. Gatling had performed for the hotline. LVMC responded that the documents in question were Pullings' personal notes, which he was not required to make or preserve, and that he had discarded any remaining notes after he stopped working on the hotline. The trial court apparently accepted LVMC's explanation; in January 1997, the court denied the motion for default judgment and sanctions as not being well-taken.

{15} The choice of sanctions for abuse of the discovery process falls within the sound discretion of the trial court and will be reversed only for abuse of discretion. *Medina v. Foundation Reserve Ins. Co.*, 117 N.M. 163, 166, 870 P.2d 125, 128 (1994). "[T]he discretion we speak of is fact-based" and "requires us to look at the facts relied on by the trial court as a basis for the exercise of its discretion, to determine if these facts are supported by substantial evidence." *Lopez v. Wal–Mart Stores, Inc.*, 108 N.M. 259, 260, 771 P.2d 192, 193 (Ct.App.1989).

{16} The trial court did not abuse its discretion. The record shows that LVMC's compliance with discovery was frequently dilatory and perfunctory. But, the record also shows that Gonzales's complaints about the severity of the discovery abuses were often inflated and that her claims as to the probative nature of Pullings' papers were speculative. The sanctions imposed were proportional to the offenses, and those the trial court refused to impose were not warranted by the conduct of the parties. *See Gonzales v. Surgidev Corp.*, 120 N.M. 151, 158, 899 P.2d 594, 601 (1995) (deferring to the trial court's decision about sanctions, absent abuse of discretion).

## B. Sufficiency of the Evidence

{17} On appeal, LVMC argues that the trial court erred when it refused to dismiss Gonzales's claim that LVMC took retaliatory action against her after she filed a discrimination complaint with the HRC. LVMC first raised the issue in a motion for summary judgment, arguing that Gonzales had failed to prove a prima facie case because she did not show an adverse employment action on the part of LVMC. LVMC's argument was continued in motions for a directed verdict after the close of evidence by Gonzales and at the close of trial, and in a motion for partial judgment notwithstanding the verdict. All these motions were denied by the trial court.

{18} When a case has been fully tried on the merits, an appellate court reviews the record to determine whether the evidence is sufficient to support the jury's verdict, rather than assessing the sufficiency

of the prima facie case. *Cf. Wilson Corp. v. State ex rel. Udall,* 121 N.M. 677, 686, 916 P.2d 1344, 1353 (Ct.App.1996) (stating that the issue on appeal is the sufficiency of all the evidence, not just that of the prima facie case). After the trial court denied their motion for directed verdict, LVMC proceeded with their case, thereby waiving any objection to the sufficiency of the evidence up to that point. *See Martinez v. City of Grants,* 1996–NMSC–061, ¶ 14, 122 N.M. 507, 927 P.2d 1045; *cf. Green v. General Accident Ins. Co. of Am.,* 106 N.M. 523, 527, 746 P.2d 152, 156 (1987) (holding that "denial of a motion for summary judgment is not reviewable after final judgment on the merits"). The motion for a judgment notwithstanding the verdict preserved LVMC's challenge to the sufficiency of the evidence for appeal. *See Barber v. Pound (In re Estate of Strozzi),* 120 N.M. 541, 544, 903 P.2d 852, 855 (Ct.App. 1995). "When a motion for judgment notwithstanding the verdict has been denied, the verdict of the jury will not be disturbed unless unsupported by substantial evidence." *Page & Wirtz Constr. Co. v. Solomon,* 110 N.M. 206, 209, 794 P.2d 349, 352 (1990). We examine the record for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoted authority and quotation marks omitted). In assessing the sufficiency of the verdict, we consider the evidence in the light most favorable to support the verdict, resolve all conflicts in the evidence in the prevailing party's favor, and give the prevailing party the benefit of all favorable inferences that are reasonable to draw from the evidence while disregarding any contrary inferences. *Smith v. FDC Corp.,* 109 N.M. 514, 519, 787 P.2d 433, 438 (1990). It is not the task of a reviewing court to sit as a trier of fact; we do not reweigh the evidence. *Id.*

{19} The Human Rights Act prohibits retaliation against any individual who has raised a discrimination complaint under the Act. Section 28–1–7(I)(2). It is an unlawful discriminatory practice for "any person or employer to ... engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under the Human Rights Act." *Id.*

{20} In interpreting our state Human Rights Act, we have previously indicated that it is appropriate to rely upon federal civil rights adjudication for guidance in analyzing a claim under the Act, with the following reservation:

> Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own. Our analysis of this claim is based on New Mexico statute and our interpretation of our legislature's intent, and, by this opinion, we are not binding New Mexico law to interpretations made by the federal courts of the federal statute.

*Smith,* 109 N.M. at 517, 787 P.2d at 436.

{21} The methodology referred to in *Smith* is the analytical framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for assessing employment discrimination claims. In *McDonnell Douglas,* the Supreme Court created the following burden shifting methodology: a plaintiff bears the initial burden of establishing a prima facie case; once the prima facie case is established, the employer bears the burden of producing evidence of a legitimate, nondiscriminatory reason for its action; and finally, a plaintiff must be afforded an opportunity to rebut the employer's proffered reason. *Id.* at 802–04, 93 S.Ct. 1817. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

{22} Although in *McDonnell Douglas* the Supreme Court explained that a prima facie case of denial of employment based on racial discrimination consists of four factors articulated in the opinion, the Court recognized that "[t]he facts necessarily will

vary in Title VII cases, and the specification ... of the prima facie case required from [claimants] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802 & n. 13, 93 S.Ct. 1817. In the Tenth Circuit, the *McDonnell Douglas* methodology has been adapted to review allegations of retaliatory adverse employment actions against those who have filed discrimination claims. *See, e.g., Jeffries v. Kansas,* 147 F.3d 1220, 1231 (10th Cir.1998); *Archuleta v. Colorado Dep't of Insts.,* 936 F.2d 483, 486 (10th Cir.1991). To establish a prima facie case in a retaliation claim, the plaintiff must prove: (1) she engaged in a protected activity, (2) she was subject to adverse employment action, and (3) a causal connection existed between the protected activity and the adverse employment action. *Jeffries,* 147 F.3d at 1231. In this case, the following jury instruction on retaliation given at trial reflected the standard articulated by the Tenth Circuit:

> In order to establish a prima facie claim of retaliation, the plaintiff must show: (1) she filed a complaint with the New Mexico Human Rights Commission alleging discrimination; (2) adverse action by the defendant subsequent to the complaint to the Human Rights Commission; and (3) a causal connection between the plaintiff's filing of the complaint and the adverse action.

{23} Reviewing the evidence presented by Gonzales at trial, we conclude that a reasonable trier of fact could have found in favor of Gonzales. The jury had heard evidence that after filing the HRC complaint: (1) she was unfairly criticized by her supervisor and told nobody would believe her allegations of discrimination; (2) she was told that Dr. Sturm had called her a trouble-maker; (3) she was transferred from the main location to a more remote building and ceased to receive client referrals; (4) the crisis hotline was renewed annually without placing the manager position up for bids; and (5) she was not given the same notice of hotline openings that was afforded to other employees. A reasonable trier of fact could have determined from this evidence that Gonzales suffered adverse employment action, which in this context refers broadly to "threats, reprisals or discrimina-

tion." Section 28–1–7(I)(2). Based upon the evidence, the jury could reasonably have believed that LVMC took retaliatory action against Gonzales after she filed the HRC complaint. The district court properly denied the motion for judgment notwithstanding the verdict. Thus, we hold that the jury reasonably concluded that retaliation was the motive behind the unfair criticism and isolation to which she was subjected, as well as LVMC's failure, after the HRC complaint, to hire Gonzales for the hotline, to give her the same notice as other employees, to permit her to apply in the same manner as other employees, and to open the management of the hotline for bids when the SM/MMHS contract was renewed each year.

## C. Evidentiary Rulings

 {24} LVMC raises a number of challenges to the trial court's rulings on the admissibility of evidence. As LVMC correctly states, a trial court has a great deal of discretion in deciding whether to admit or exclude evidence and will be reversed on those decisions only when it is clear that the court has abused its discretion. *Behrmann v. Phototron Corp.,* 110 N.M. 323, 327, 795 P.2d 1015, 1019 (1990). The decision to admit evidence from an administrative hearing also falls within the discretion of the trial court. *Id.* (stating that administrative hearings can vary in timeliness, investigator's skill and experience, whether a hearing was held, and the motivation of the parties). We have reviewed the rulings of the trial court and find no abuse of discretion.

 {25} LVMC contends that they should have been permitted to introduce evidence about the structure of the reorganized crisis hotline in November 1995, an untimely application by Gonzales to work on that hotline, and the number of hours she worked on the hotline in 1996 as evidence of the lack of discrimination and retaliation. Gonzales objected because the evidence LVMC wanted to introduce occurred after the time period that formed the basis for her damages claim. She claimed that the acts of discrimination and retaliation occurred in the six-year period between November 1989, when the hotline

began, until November 1995, when the hotline structure and application procedures were changed by Dr. Buff. Gonzales argues that the evidence was properly excluded under Rule 11–402 NMRA 2000 because it was not relevant to the issues at trial. Gonzales also relies on Rule 11–403, which permits the trial court to exclude evidence that might confuse the issues. We are not persuaded that the trial court abused its discretion in excluding evidence about hotline activity occurring after the relevant time period.

{26} LVMC argues that it was also error for the trial court to exclude evidence about the unfavorable outcome of the HRC investigation and hearing concerning Gonzales's discrimination claim. LVMC had initially filed a motion in limine to prohibit introduction of evidence about the HRC hearing at trial arguing that, because the trial was de novo, the administrative proceedings were irrelevant. In response, the trial court ruled that Gonzales could introduce evidence of the fact that she filed the HRC complaint to establish the basis for her retaliation claim, but permitted no testimony about the HRC proceeding or outcome. Both parties had an opportunity to present to the jury all the evidence that had been introduced during the HRC hearing. During trial, however, LVMC sought to introduce evidence of the HRC determination against Gonzales. The trial court denied the request on the basis that under Section 28–1–13(A) of the Human Rights Act the trial in district court was to be a trial de novo. We find no error in the decision of the trial court; admission of the HRC evidence might well have sidetracked the trial into an evaluation of the merits of that decision rather than focusing on the issues at trial. *Cf. Behrmann*, 110 N.M. at 328, 795 P.2d at 1020.

{27} LVMC claims that the trial court erred when it refused to admit its mitigation evidence and to instruct the jury on mitigation of damages. Generally, a "discharged employee must mitigate his or her damages by securing other employment if

not reinstated by defendant." *Vigil v. Arzola*, 102 N.M. 682, 689, 699 P.2d 613, 620 (Ct.App.1983), *rev'd in part on other grounds;* 101 N.M. 687, 687 P.2d 1038 (1984), *and overruled in part on other grounds by Chavez v. Manville Prods. Corp.*, 108 N.M. 643, 650, 777 P.2d 371, 378 (1989) (recognizing an employee's duty of mitigation). LVMC had wanted to show that Gonzales could have worked overtime on a different hotline operated by social workers at SM/MMHS, as opposed to the LVMC hotline staffed by psychologists, during the relevant period. The trial court excluded the evidence about the other hotline and also refused to instruct the jury on the issue of mitigation. On appeal, LVMC claims that, had the trial court not excluded mitigation evidence, it would have shown that substantially equivalent work existed and that Gonzales did not make reasonable attempts to obtain it. Gonzales vigorously disputed the equivalency of the two hotlines as career opportunities and also argued that she was unaware of the second hotline and any job opportunities it might present.[1] Under the facts and circumstances of this case, involving the issue of opportunity for overtime pay rather than alternative employment, the trial court could properly have concluded that evidence of the social worker hotline was not relevant to the issue of mitigation.

### D. Jury Instructions

{28} Both parties object to the trial court's refusal to give certain of their submitted jury instructions. An appellate court reviews challenged jury instructions to determine whether they correctly state the law and are supported by the evidence introduced at trial. *Pittard v. Four Seasons Motor Inn, Inc.*, 101 N.M. 723, 727, 688 P.2d 333, 337 (Ct.App.1984); *see* Rule 1–051(A), (B) NMRA 2000.

{29} LVMC objects to the trial court's refusal of their instruction on mitigation of damages. Because we find no error in the exclusion of the mitigation evidence, we

---

1. It was the disclosure of the existence of this hotline during discovery in 1996 that led Gonzales to file a motion for sanctions against LVMC for abuse of discovery, claiming that LVMC had withheld this information from the HRC hearing. As a result, the trial court awarded Gonzales $7968.75 in attorney's fees and costs.

agree with the court's decision to refuse the instruction which was based on the excluded evidence. *See* UJI 13–301 to –08 Introduction NMRA 2000. ("It is the evidence adduced at trial which truly determines the issues for jury determination. Regardless of the pleadings, it is the duty of the court to submit to the jury only those issues which are supported by the evidence and determinative of the case.")

{30} Gonzales claims that the trial court erred when it refused her proposed jury instruction on disparate impact as a form of discrimination. A disparate impact claim differs from a disparate treatment claim in that it does not involve a showing of discriminatory intent, but rather addresses those situations when an apparently neutral employment policy has a discriminatory effect. *Ortega v. Safeway Stores, Inc.,* 943 F.2d 1230, 1242 (10 th Cir.1991); *cf. Hill v. Community of Damien of Molokai,* 121 N.M. 353, 364–66, 911 P.2d 861, 872–74 (1996) (analyzing the discriminatory effect of a facially neutral restrictive covenant on group homes). A plaintiff may establish a prima facie case of disparate impact discrimination by showing that a "specific identifiable employment practice or policy caused a significant disparate impact on a protected group." *Ortega,* 943 F.2d at 1242. Statistical evidence showing that a protected class is under-represented in a given employment situation may be used to a demonstrate disparate impact. *See Smith,* 109 N.M. at 519 n. 4, 787 P.2d at 438 n. 4. In order to establish a prima facie case, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

{31} As evidence of her claim, Gonzales relies primarily on an exhibit showing total overtime earnings on the LVMC psychologist hotline for the relevant period, broken down by the individual participants. On appeal, she claims the exhibit demonstrated disparate impact because Hispanic psychologists earned significantly less than their Anglo counterparts during that time period. Gonzales appears to be arguing that because the Hispanic psychologists' overtime earnings were not proportional to their representation on the hotline, this constitutes prima facie evidence of disparate impact-that the distribution of earnings alone proves that a discriminatory practice must have existed.

{32} The trial court did not err in refusing the jury instructions because Gonzales did not present sufficient evidence of disparate impact. She did not identify a facially neutral practice of LVMC or tie the earnings chart to any LVMC practice. *See Ortega,* 943 F.2d at 1242. Additionally, statistical evidence offered in support of a claim of disparate impact "must cross a threshold of reliability before it can establish even a prima facie case of disparate impact." *Id.* at 1243 (quoted authority and quotation marks omitted). The earnings chart does not meet that threshold of reliability; it does not indicate the number of hours worked by each individual, their length of service on the hotline, their responsibilities on the hotline, or differing hourly rates of pay among the employees. Gonzales included herself on the chart as an Hispanic psychologist even though she did not work on the hotline during this period, which further distorted the alleged relationship between Hispanic participants and their earnings. Gonzales introduced no expert testimony to explain whether her statistics were demonstrative of discrimination. Thus, on their face, the statistics are of questionable merit. *Cf. Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 651–53, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (concluding that a prima facie case fails because of flawed statistics); *Watson,* 487 U.S. at 995, 108 S.Ct. 2777 (stating that "statistical disparities must be sufficiently substantial that they raise an inference of causation").

{33} Gonzales also proposed a jury instruction directed at Dr. Hernandez, based on dicta in *Dominguez v. Stone,* 97 N.M. 211, 213, 638 P.2d 423, 425 (Ct.App.1981), stating that it was possible for a member of a minority group to practice discrimination against members of the same minority group. She

argues that the trial court erred in refusing the instruction. Even assuming that the instruction contained a correct statement of the law, it must be supported by evidence introduced at trial. *See Pittard,* 101 N.M. at 727, 688 P.2d at 337. Gonzales does not cite to any evidence in the record that would have supported giving such an instruction.

### E. Attorney's Fees

{34} When the trial court entered a judgment for Gonzales for $170,000 in accordance with the jury's verdict, it also provided for costs and attorney's fees as provided by law. The trial court received affidavits and held a hearing on the matter of attorney's fees, after which it awarded Gonzales attorney's fees of $90,384 plus gross receipts tax and costs. The award reflected the fees and costs for pursuing the retaliation claim in district court but not for the discrimination claim because Gonzales had not prevailed on that issue. Gonzales had also requested attorney's fees for the representation she received in the HRC hearing, which the trial court refused. On appeal, Gonzales argues that the court erred by not awarding full attorney's fees for the district court litigation and by denying attorney's fees for the HRC legal representation.

{35} The award of attorney's fees in this case is governed by Section 28–1–13(D) of the Human Rights Act: "In any action or proceeding under this section if the complainant prevails, the court in its discretion may allow actual damages and reasonable attorney's fees, and the state shall be liable the same as a private person." We review the award of attorney's fees for abuse of discretion. *Lucero v. Aladdin Beauty Colleges, Inc.,* 117 N.M. 269, 271, 871 P.2d 365, 367 (1994). Analogous principles for addressing the award of attorney's fees may be found in federal civil rights cases. *See Hensley v. Eckerhart,* 461 U.S. 424, 434–36, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). If a plaintiff has obtained only partial success, an award determined by using the hours spent on the whole litigation may be excessive. *Id.* at 436, 103 S.Ct. 1933.

{36} Gonzales had two complaints against LVMC: employment discrimination and re-taliatory acts. She was not successful in pursuing the discrimination claim before the HRC or in district court. Section 28–1–13(D) of the Human Rights Act may be interpreted to include attorney's fees for administrative proceedings, but in order to receive the fees, the complainant must prevail. The trial court did not abuse its discretion by refusing the award of attorney's fees for her representation before the HRC. To the extent that the trial court reduced her attorney's fees because of the failure of the discrimination claim at trial, we find no abuse of discretion.

### F. Interest on Attorney's Fees and the Judgment

{37} Gonzales moved the court to assess interest on the judgment, fees, and costs. The trial court declined any accrual of interest, and Gonzales claims this was an abuse of discretion. Gonzales bases her claim on what we consider to be an erroneous construction of two statutes. She relies upon NMSA 1978, § 56–8–4(A) (1993), which provides that "[i]nterest shall be allowed on judgments and decrees for the payment of money." However, subsection (D) of this statute states that "[t]he state and its political subdivisions are exempt from the provisions of this section except as otherwise provided by statute or common law." Section 56–8–4(D). In contrast, Section 28–1–13(D) of the Human Rights Act states that, with respect to actual damages and attorney's fees, "the state shall be liable the same as a private person." Gonzales contends that Section 28–1–13(D) is a statutory exception that requires LVMC to pay interest because it makes the state "liable the same as a private person."

{38} We do not find Gonzales's argument persuasive for two reasons. First, an interest award under Section 56–8–4 is not an absolute right, but rather is a matter to be left to the discretion of the trial court. *See Kennedy v. Moutray,* 91 N.M. 205, 206, 572 P.2d 933, 934 (1977) ("Interest is an element of damages to be considered by the trial court."); *Trujillo v. Beaty Elec. Co.,* 91 N.M. 533, 538, 577 P.2d 431, 436 (Ct.App. 1978) ("The granting of interest is within the

discretion of the trial court and is not a matter of right under the statute."). Second, Section 28–1–13(D) makes no mention of the assessment of interest, and Gonzales has offered no authority suggesting that the phrase "actual damages and reasonable attorney's fees" should be expanded to include interest. We decline to consider such an expansion. The trial court did not abuse its discretion by refusing to permit the accrual of interest.

## III. CONCLUSION

{39} For the foregoing reasons we affirm the trial court. Specifically, we affirm all the trial court's determinations regarding discovery sanctions; the jury's conclusion that Gonzales was a victim of retaliation; the trial court's decisions not to admit evidence that LVMC claims would have rebutted Gonzales's claim of retaliation; the trial court's exclusion of evidence and jury instructions regarding mitigation of damages; the trial court's ruling denying Gonzales's requested jury instructions; and the trial court's determination not to award attorney's fees for Gonzales's discrimination claim at trial and for the HRC hearing because her claim did not prevail before either tribunal. Finally, the trial court properly refused to permit the accrual of interest on the judgment and attorney's fees.

{40} IT IS SO ORDERED.

BACA, SERNA, and MAES, JJ., concur.

MINZNER, Chief Justice (specially concurring).

### SPECIAL CONCURRENCE

MINZNER, Chief Justice.

{41} I concur in the opinion authored by Justice Franchini with the following exception. I am not persuaded that we ought to rely on all of the facts listed by the Court in paragraph 23 in affirming the jury's verdict. I write separately to emphasize the significance, for me, of some of the facts.

{42} As the opinion notes in paragraph 22, Ana Gonzales was required to show she was subject to an adverse employment action. Under federal law, an adverse employment action occurs when an employer imposes a tangible, significant, harmful change in the conditions of employment. *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Adverse employment actions cover more than quantifiable losses of salary or benefits. *Jeffries v. Kansas,* 147 F.3d 1220, 1232 (10th Cir.1998). For purposes of a Title VII retaliation claim, an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity. *Chuang v. University of Cal. Davis,* No. 99–15036, 2000 WL 1224780 (9th Cir. Aug.30, 2000). Actions having an adverse impact on future employment opportunities can constitute adverse employment actions for purposes of Title VII retaliation claims. *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996). In addition, "reassignment with significantly different responsibilities" can be an adverse employment action. *Burlington,* 524 U.S. at 761, 118 S.Ct. 2257.

{43} The jury heard testimony that Gonzales was moved to an isolated office outside the main building shortly after filing her discrimination complaint and that she ceased to receive referrals for new patients after her move to the new office. This evidence is a sufficient basis upon which the jury could have concluded that Gonzales had suffered an adverse employment action. Though Gonzales did not suffer a reduction in salary or benefits or a change in job title, forcing Gonzales to relocate to a more remote location and ceasing to refer new patients to her could have been interpreted by the jury to be practices designed to physically isolate Gonzales from her peers, single her out from other psychologists by virtue of a reduced patient load, and negatively affect her opportunities for future promotions. Based on this evidence, the jury could have found that Las Vegas Medical Center's actions were designed to force Gonzales out of her job in retaliation for her discrimination complaint.

{44} For these reasons, I specially concur.