2001-NMSC-003

16 P.3d 1084

Donna GARCIA–MONTOYA,
Plaintiff–Appellant,

v.

State of New Mexico, STATE TREASUR-
ER'S OFFICE, Michael Montoya, Rob-
ert Andermann, and Joan G. "Jody"
Hooper, each in their individual capaci-
ties, Defendants–Appellees.

No. 25,668.

Supreme Court of New Mexico.

Jan. 18, 2001.

**28**

Sommer, Fox, Udall, Othmer, Hardwick & Wise, P.A., Jack N. Hardwick, Santa Fe, NM, for Appellant.

Herrera, Long & Pound, P.A., Judith C. Herrera, Mark E. Komer, Santa Fe, NM, for Appellees.

*OPINION*

SERNA, Chief Justice.

{1} Donna Garcia–Montoya appeals from the district court's grant of summary judgment in favor of Defendant the State Treasurer's Office (STO) on a claim of sex discrimination under the New Mexico Human Rights Act, NMSA 1978, §§ 28–1–1 to 15 (1969, as amended through 2000), and in favor of Defendants State Treasurer Michael Montoya and Deputy State Treasurer Robert Andermann on claims of breach of Garcia–Montoya's constitutional rights, intentional infliction of emotional distress, and defamation. This Court has jurisdiction over this appeal pursuant to NMSA 1978, § 28–1–13(C) (1987). We affirm in part and remand for reconsideration in part.

**I. Facts**

{2} Garcia–Montoya was an employee of the STO. During David King's term as State Treasurer, Garcia–Montoya held the position of deputy director of administrative services. For the 1994 Democratic Party primary election, Garcia–Montoya campaigned for King. Defendant Montoya prevailed in both the primary and general elections for the seat of State Treasurer. Once Montoya took office, Garcia Montoya served as director of administrative services.

{3} In an affidavit, Garcia–Montoya described a pattern of politically motivated conduct from Montoya following the general election. Garcia–Montoya stated that Montoya, prior to taking office, asked her to call in sick for the last week of King's term in order to obstruct several last-minute promotions. Garcia–Montoya refused this request. After taking office, Montoya told Garcia–Montoya that he planned to "get his people in," that she had been too close to King, and that if she did not support Montoya she would regret his "wrath." Over the next few months, Garcia–Montoya questioned Montoya and his deputy treasurer, Defendant Andermann, about numerous personnel actions because she believed they violated personnel rules. She indicated to Montoya that she believed his employment decisions were politically motivated.

{4} In September of 1995, Montoya and Andermann transferred Garcia–Montoya from the position of director of administrative services to a newly created position designated as acting director of the local government investment pool. According to Garcia–Montoya, one of her subordinates was assigned to monitor her while she transferred her belongings to a new office and to inspect her belongings before she left her former office. Additionally, a locksmith changed the door locks for her former office while she packed her belongings. Garcia–Montoya claimed in her affidavit that when she confronted Montoya about the basis for the transfer he told her that he did not "trust any of you." Garcia–Montoya understood the remark to mean any King supporters in the office. Garcia–Montoya alleged that she became emotionally distraught as a result of the circumstances surrounding the transfer and that she was unable to return to work.

{5} Following her transfer and inability to return to work, Garcia–Montoya filed suit in the district court against her former employer, the STO, as well as against Montoya and Andermann.[1] Appealing an order of nondetermination from the Human Rights Division, *see* NMSA 1978, § 28–1–10(D) (1995), Garcia–Montoya claimed that the STO engaged in unlawful discrimination on the basis of sex in violation of the Human Rights Act. *See* NMSA 1978, § 28–1–7(A) (1995) (providing that it is unlawful discrimination for "an employer, unless based on a bona fide occupational qualification, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of ... sex"). Additionally, Garcia–Montoya alleged that Montoya and Andermann violated her constitutional rights to freedom of political association and free speech contrary to federal law, *see* 42 U.S.C. § 1983 (1994), *amended by* 42 U.S.C. § 1983 (Supp. IV 1998), and intentionally caused her to suffer extreme emotional distress. Garcia–Montoya also included a claim of defamation against Andermann.

{6} Montoya and Andermann denied Garcia–Montoya's allegations of politically motivated conduct. They filed a motion for summary judgment based on the affirmative defense of qualified immunity in response to Garcia–Montoya's claim under Section 1983 and based on immunity under the Tort Claims Act, NMSA 1978, §§ 41–4–1 to 29 (1976, as amended through 1995, prior to 1996, 1999, & 2000 amendments), with respect to her claims of intentional infliction of emotional distress and defamation, *see* NMSA 1978, § 41–4–4(A) (1989, prior to 1996, 1999, & 2000 amendments). The STO also moved for summary judgment on Garcia–Montoya's claim under the Human Rights Act, contending that she failed to provide any evidence of intentional sex discrimination. The district court granted Defendants' motion for summary judgment with respect to each of Garcia–Montoya's claims.

## II. Standard of Review

{7} "Summary judgment is proper if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Roth v. Thompson,* 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992); *accord* Rule 1–056(C) NMRA 2000. In order to rule on a motion for summary judgment under Rule 1–056, courts must resolve all reasonable inferences in favor of the nonmovant and must view the pleadings, affidavits, depositions, answers to interrogatories and admissions in a light most favorable to a trial on the merits. *See Carrillo v. Rostro,* 114 N.M. 607, 615, 845 P.2d 130, 138 (1992). "If there is the slightest doubt as to the existence of material factual issues, summary judgment should be denied." *Las Cruces Country Club, Inc. v. City of Las Cruces,* 81 N.M. 387, 387, 467 P.2d 403, 403 (1970). "Summary judgment is a drastic remedy to be used with great caution," *Pharmaseal Lab., Inc. v. Goffe,* 90 N.M. 753, 756, 568 P.2d 589, 592 (1977), and because summary judgment involves a question of law, we review the district court's ruling de novo, *Phoenix Indem. Ins. Co. v. Pulis,* 2000 NMSC 023, ¶ 6, 129 N.M. 395, 9 P.3d 639.

## III. Federal Claims under Section 1983

{8} Section 1983 provides a cause of action for money damages against a state official in his or her individual capacity for the deprivation of federal constitutional or statutory rights. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that Section 1983 does not extend to actions against States or state officials in their official capacity); *see also Kennedy v. Dexter Consol. Sch.,* 2000 NMSC 025, ¶ 9, 129 N.M. 436, 10 P.3d 115. Under Section 1983, a state official's individual liability is limited by qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 813–19 & n. 30, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity "shield[s] [government officials performing

---

1. Garcia–Montoya also sued the director of the State Personnel Office, Jody Hooper, under Section 1983 for violating her constitutional rights to freedom of political association and free speech. The district court granted Hooper's motion for summary judgment on the basis of qualified immunity, and Garcia–Montoya does not appeal from that judgment.

discretionary functions] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. 2727. Qualified immunity is necessary to protect public officers "from undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806, 102 S.Ct. 2727.

{9} The United States Supreme Court has established the proper procedure in assessing a claim of qualified immunity. "A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quotation marks and quoted authority omitted). Applying this analytical guideline, we separately address Garcia–Montoya's Section 1983 claims, determining first whether there is a genuine issue of material fact as to whether Montoya and Andermann violated Garcia–Montoya's actual constitutional rights and second whether those rights, if violated, were clearly established at the time. "Deciding the constitutional question before addressing the qualified immunity question . . . promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Id.* For the reasons discussed below, we conclude that, although there are genuine issues of material fact concerning the violation of Garcia–Montoya's constitutional rights, Defendants are entitled to qualified immunity.

## A. Freedom of Political Association

{10} In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the United States Supreme Court addressed the constitutionality of the practice of political patronage in the context of the First Amendment. A plurality of the Court explained that "political belief and association constitute the core of those activities protected by the First Amendment." *Id.* at 356, 96 S.Ct. 2673 (plurality opinion). "Patronage, therefore, to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment." *Id.* at 357, 96 S.Ct. 2673 (quotation marks and quoted authority omitted).

{11} Despite the interference with the freedom of association, however, the plurality opined that political patronage would be permissible "for appropriate reasons." *Elrod,* 427 U.S. at 360, 96 S.Ct. 2673. Specifically, under the standard of an exacting scrutiny, the governmental official accused of engaging in political patronage must show an interest of vital importance and must demonstrate that the means chosen to advance the vitally important interest are the least restrictive of the freedom of political belief and association. *Id.* at 362–63, 96 S.Ct. 2673. In the context of the present case, the vitally important end of political loyalty of employees may be achieved by patronage dismissals of policymaking positions but may not extend to non-policymaking employees. *Id.* at 367, 96 S.Ct. 2673. "No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical." *Id.* at 367, 96 S.Ct. 2673. The Court subsequently emphasized that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Because there is a "presumptive prohibition on infringement" of the First Amendment freedoms of political belief and association, *Elrod,* 427 U.S. at 360, 96 S.Ct. 2673, the burden of demonstrating that a position is subject to political patronage rests with the hiring authority, and "cases of doubt [are] resolved in favor" of an employee who is dismissed for political reasons. *Id.* at 368, 96 S.Ct. 2673.

{12} Garcia–Montoya contends that Montoya and Andermann transferred her due to her support of their political opponent and ultimately replaced her with a political ally. The Supreme Court has provided that "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Rutan v. Republican Party*, 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Resolving all reasonable inferences in favor of the opponent of summary judgment, we believe Garcia–Montoya adequately raised a presumption of an impermissible infringement of her First Amendment rights, and the burden falls on Montoya and Andermann to demonstrate that the position of director of administrative services is subject to political patronage. *See Laidley v. McClain*, 914 F.2d 1386, 1392 (10th Cir.1990) (stating that a plaintiff satisfies the burden under *Elrod–Branti* by raising "a genuine issue of material fact as to whether [the] exercise of protected First Amendment activity was a substantial or motivating factor in" the adverse employment action), *overruled on other grounds by Shalala v. Schaefer*, 509 U.S. 292, 302–03, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). Montoya and Andermann claim that the political loyalty exception to the prohibition against political patronage applies to Garcia–Montoya's former position at the STO.

{13} In evaluating whether a particular position is subject to employment action, such as a transfer, based on political patronage, we examine the inherent duties of the position. *See Sanders v. Montoya*, 1999 NMCA 079, ¶ 17, 127 N.M. 465, 982 P.2d 1064. Nonetheless, a plaintiff's actual duties, as well as the duties performed by the plaintiff's replacement, may be considered as evidence of the inherent duties of the position as it is conceived by the public official accused of engaging in impermissible political patronage. *E.g., Feeney v. Shipley*, 164 F.3d 311, 320 (6th Cir.1999) (noting that actual duties accurately reflected the inherent duties of the position); *Faughender v. City of North Olmsted*, 927 F.2d 909, 913 (6th Cir.1991) (considering both the inherent duties of the position and the planned duties of the new holder of the position); *Dickeson v. Quarberg*, 844 F.2d 1435, 1442 (10th Cir.1988) (focusing on the inherent duties of the position as well as the actual duties performed), *applied in Jantzen v. Hawkins*, 188 F.3d 1247, 1253 & n. 1 (10th Cir.1999).

{14} The inquiry under *Elrod–Branti* is necessarily fact specific. Even though the test of appropriateness for effective performance identified in *Branti* is somewhat vague and difficult to apply, courts have articulated a number of factors that are useful in determining whether a particular position is subject to political patronage: the extent to which duties are clearly defined and non-discretionary as opposed to vague and broad, relative pay, the need for technical expertise in carrying out the duties of the position, the extent of power to control others, the authority to speak with the public, other entities, or elected officials on behalf of policymakers, the relative influence on important programs, the preparation of budgets, and the ability to hire and fire other employees. *See Assaf v. Fields*, 178 F.3d 170, 176 (3d Cir.), *cert. denied*, 528 U.S. 951, 120 S.Ct. 374, 145 L.Ed.2d 292 (1999); *Fazio v. City of San Francisco*, 125 F.3d 1328, 1334 n. 5 (9th Cir.1997); *see also Jantzen*, 188 F.3d at 1256 (discussing whether employees "were such important communicators or were privy to confidential information to such an extent that political loyalty would be an appropriate job requirement"). Courts have also restated *Branti's* test as a determination of whether the position permits meaningful input into issues for which there is room for principled disagreement on the nature and scope of policy goals. *See, e.g., Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 396–97 (3d Cir.1998). As explained below, we conclude, based on these factors and viewing the evidence in a light most favorable to Garcia–Montoya, that Defendants have failed to demonstrate that Garcia–Montoya's former position is subject to political patronage. However, we believe that Defendants are entitled to qualified immunity because a reasonable official in 1995 could have believed that the political loyalty exception applied to Garcia–Montoya's position.

### 1. The Political Loyalty Exception

■ {15} In her affidavit, Garcia–Montoya averred that she "never had any authority to establish any policy decisions concerning personnel, budget or budget allocations, for the State Treasurer's Office." *During her deposition, she described her duties generally as overseeing "the budget area, personnel, telecommunications, [and] information systems."* Garcia–Montoya indicated that she formulated a budget under the Treasurer's direction, and she explained that her work on the budget included analyzing the reasonableness of the Treasurer's proposals and making recommendations based on applicable rules and regulations. Garcia–Montoya accepted defense counsel's characterization of the work as "basically see[ing] that the office budget stayed on track." *Garcia–Montoya's work in the areas of telecommunications and information systems essentially consisted of the purchasing of supplies.*

{16} Regarding her responsibilities in the area of personnel, Garcia–Montoya handled the paperwork for personnel actions. Although Garcia–Montoya indicated that she questioned certain personnel decisions made by Montoya and Andermann based on her familiarity with personnel rules, she did not indicate whether advice on personnel matters formed one of the inherent duties of her position. She stated that she was not asked directly whether a termination was appropriate under the personnel rules, but she said, "That's the kind of thing I should have been involved in." *Garcia–Montoya was involved in only one interview of applicants for a position at the STO under David King, and she was not involved in any interviews as director of administrative services under Montoya.* On one occasion, Andermann requested that Garcia–Montoya participate in a panel interview of applicants for a position, *but she refused due to her belief that the applicants had been pre-selected contrary to personnel rules.* Finally, she advised Montoya concerning the addition of positions that she believed would benefit the office. Garcia–Montoya was classified as a financial manager I, a classification which applies to a group of positions and which is defined as

assisting or directing agency fiscal and budget analysis activities.

{17} Montoya and Andermann did *not* provide a detailed list of inherent duties for the position of director of administrative services. According to Andermann, the duties "included advising the Treasurer on personnel issues and ensuring that the budget complies with all legal and procedural requirements." For the most part, Montoya and Andermann relied on Garcia–Montoya's description of her duties in claiming that her position is subject to political patronage.

{18} Garcia–Montoya's job title is not dispositive. *See, e.g., Milazzo v. O'Connell,* 108 F.3d 129, 133 n. 1 (7th Cir.1997) (stating that "merely being a supervisor/administrator is not sufficient" to create an exception to the prohibition against political patronage dismissals). Further, it is clear from Garcia–Montoya's description of her position that her duties in relation to the areas of telecommunications and information systems were *merely ministerial in nature.* The purchasing of supplies does not implicate partisan issues. We more closely scrutinize Garcia–Montoya's responsibilities in the areas of personnel and the budget, however, because these duties, if sufficiently broad and discretionary, can result in a need for political affiliation for effective performance. *See, e.g., Peters v. Del. River Port Auth.,* 16 F.3d 1346, 1358 (3d Cir.1994) ("[P]reparing budgets and promoting projects are duties which count in favor of finding that the exception to *Branti–Elrod* applies."); *Flynn v. City of Boston,* 140 F.3d 42, 45 (1st Cir.1998) (mentioning the relevance of "important personnel functions").

{19} Some of the facts highlighted by Montoya and Andermann indicate a substantial role in the areas of personnel and the budget. *See Elrod,* 427 U.S. at 368, 96 S.Ct. 2673 (plurality opinion) (stating that "consideration should also be given to whether the employee acts as an adviser"). These facts tend to support the view that political affiliation is an appropriate requirement for Garcia–Montoya's position. *See Feeney,* 164 F.3d at 321 (stating that the expenditure of significant tax revenues is "one of the most important policymaking decisions in govern-

ment"); *Bicanic v. McDermott,* 867 F.2d 391, 394 (7th Cir.1989) (stating that "public officials must be able to count on the support of those who prepare budgets, negotiate and sign contracts, and generally run the show at a substantial component of the government").

{20} However, other facts alleged by Garcia–Montoya support a contrary inference. Garcia–Montoya stated that she basically tried to keep the budget on track. As a result, it is unclear whether her use of the term "formulation" actually referred to the implementation of a budget that was formulated by the Treasurer. *See Jantzen,* 188 F.3d at 1255 n. 3 (distinguishing policy implementation from policy formulation for purposes of a political loyalty inquiry). Additionally, according to Garcia–Montoya, she filled out the paperwork for personnel actions, did not participate in interviews, was not consulted about personnel decisions, and had no power to hire or fire other employees. This description is supported by Montoya's deposition testimony that Garcia–Montoya's job consisted of "paying the bills and filing personnel matters and adding up the hours for everybody to get them their paycheck." Further, Andermann described the position as involving "internal support." *Cf. Assaf,* 178 F.3d at 178 (distinguishing positions "relat[ing] to the government's activity vis-a-vis the public" from those involving "a largely endogenous function of the state government and as such serve[ ] an internal and practical purpose").

{21} We also believe it is significant that Garcia–Montoya received an excellent performance evaluation after Montoya had been in office for approximately six months, despite the fact that she questioned several of his personnel decisions during that period. The relevant inquiry under *Branti–Elrod* is the effective performance of the duties of the public office, and we believe that a favorable performance evaluation completed after a significant period of time under the new administration "severely undermine[s][the] summary judgment argument that political affiliation and loyalty are as a matter of law indisputably valid justifications for" employment action based on political patronage. *Jantzen,* 188 F.3d at 1253–54 (relying on actual performance based on "ample proof that [the employees] did effectively perform their jobs despite political differences"). Finally, we note that there is no evidence that Garcia–Montoya was authorized to speak or act on behalf of Defendants, a compelling, though not necessarily critical, factor in determining the applicability of the political loyalty exception. *See, e.g., Sanders,* 1999 NMCA 079, ¶ 15, 127 N.M. 465, 982 P.2d 1064; *Gordon v. County of Rockland,* 110 F.3d 886, 890 (2d Cir.1997) (stating that acting or speaking on behalf of a policymaker is of "primary importance" in that circuit); *Peters,* 16 F.3d at 1358 ("[P]arty affiliation is unquestionably significant to the ... duties of maintaining good public relations and acting as a liaison with public officials.").

{22} These facts could be interpreted as placing some of the duties of the position highlighted by Montoya and Andermann, such as acting as an advisor, in context. As a result, we believe these facts could support Garcia–Montoya's contention that the director of administrative services does not have meaningful input into the substantive policy decisions of the Treasurer, does not serve as an important communicator on behalf of the STO, and is not privy to confidential information to such an extent as to require political loyalty. *Cf. Assaf,* 178 F.3d at 176–79 (concluding that summary judgment in favor of the public official was not appropriate in relation to a position that "did not have significant input into a major governmental program" and "did not involve significant contact with the public" because the generic duties of participating in meetings and controlling others "could just as well apply to any public employee with a measure of supervisory responsibility"); *Milazzo,* 108 F.3d at 130–33 (concluding that a human resources administrator who implemented hiring policies, worked on budget and payroll issues, provided information on job applicants, and administered a summer program was not, as a matter of law, subject to political patronage dismissal under *Branti* because the position was not autonomous or discretionary, did not include the power to hire or fire, and did not include the formulation of personnel policy). *But cf. Feeney,* 164 F.3d at 321 (discussing an employee with

"extensive discretion over how the public fisc would be used to achieve the aims of [the] department").

{23} Based on the standard of review applicable at summary judgment, we must draw every reasonable inference in favor of the nonmovant. Additionally, we must bear in mind the Supreme Court's admonition that cases involving doubt must be resolved in favor of the First Amendment protection against political patronage. Montoya and Andermann have failed to provide a detailed list of inherent duties, or the duties of Garcia Montoya's replacement, that would illuminate the extent of Garcia–Montoya's involvement in personnel and budgetary matters. Thus, viewing the facts in a light most favorable to a trial on the merits, we believe that there is a genuine issue of material fact as to whether "party affiliation is an appropriate requirement for the effective performance of" Garcia–Montoya's former position. *Branti*, 445 U.S. at 518, 100 S.Ct. 1287. Defendants have therefore failed to demonstrate a vitally important interest sufficient to justify infringement on Garcia–Montoya's freedom of political belief.

**2. Qualified Immunity**

█ {24} As articulated above, a public official is entitled to qualified immunity in the performance of a discretionary function if the constitutional or statutory right alleged to have been violated was not "clearly established" at the time of the official's conduct. *Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Supreme Court has explained that, in order to be "clearly established," it is not necessary that "the very action in question has previously been held unlawful." *Id.* at 640, 107 S.Ct. 3034. In order to allow officials to "know that they will not be held personally liable as long as their actions are reasonable in light of current American law," *id.* at 646, 107 S.Ct. 3034, the Court has defined a

"clearly established" right as one that has "sufficiently clear [contours] that a reasonable official would understand that what he [or she] is doing violates that right." *Id.* at 640, 107 S.Ct. 3034. "[I]n the light of pre-existing law the unlawfulness [of the governmental official's action] must be apparent." *Id.*

{25} At the time that Montoya and Andermann allegedly transferred Garcia–Montoya based on political affiliation in 1995, it was clearly established under *Branti* that the First Amendment prohibits political patronage unless political affiliation is an appropriate requirement for the effective performance of the public office involved. Further, by 1995, numerous courts had the opportunity to interpret, clarify, and apply *Branti* in the context of a number of different public offices. *See Roldan–Plumey v. Cerezo Suarez*, 115 F.3d 58, 66 (1st Cir.1997) (stating that the law concerning political patronage "grew much clearer in the late 1980s and early 1990s"). As a result, examining the right involved in this case, we believe that the contours of the right are generally well-defined and that reasonable officials in the majority of cases will be aware of a violation of the freedom of political belief.[2]

{26} Nonetheless, with respect to the position involved in this case, we believe that the contours of the right are not "sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034; *see Roldan–Plumey*, 115 F.3d at 66 ("To be sure, the law may still be blurred around the edges."). In *Elrod*, the plurality referred to the importance of political affiliation with respect to advisors, and several courts have listed involvement in personnel and budgetary matters as an important factor in determining the applicability of the *Branti–Elrod* exception to political patron-

---

**2.** Montoya and Andermann claim that the right in this case is not clearly established because Garcia–Montoya "has not provided any case that says that her job duties as the acting director of administrative services are protected by the First Amendment from politically-based decisionmaking." Although *Branti* requires a case-by-case inquiry into the inherent duties of a particular position, a requirement of case law specifically

addressing the position at issue to defeat a claim of qualified immunity would "effectively eviscerate" the First Amendment protection against political patronage. *Carrillo*, 114 N.M. at 622, 845 P.2d at 145 (quotation marks and quoted authority omitted) (addressing a similar argument in relation to the termination of an employee because of the employee's speech).

age. In this case, it is clear that Garcia–Montoya had some significant level of involvement in these areas. *But cf. Assaf,* 178 F.3d at 179 (concluding that summary judgment on the issue of qualified immunity was inappropriate "[i]n light of [the employee's] lack of any significant contact with the public and the *undisputed fact* that [the employee's] level of responsibility did not touch on politically sensitive issues, which would raise the likelihood of serious political embarrassment" (emphasis added)). Although we believe that ambiguities in the scope of these responsibilities prevent a conclusion of law that political affiliation is an appropriate requirement for effective performance, our determination on this issue has been largely informed by cases decided after 1995 distinguishing between policy formulation and policy implementation and between internal functions of a governmental agency and the agency's relations with the public and other governmental entities. *See, e.g., Assaf,* 178 F.3d at 176–79; *Milazzo,* 108 F.3d at 130–33. Thus, while we believe there is a genuine issue of material fact as to whether the advice required of Garcia–Montoya's position concerned matters of policy or, instead, related solely to the internal workings of the STO and whether Garcia–Montoya's position entails meaningful input into a major governmental program, we also believe that a reasonable official in Montoya's or Andermann's position in 1995 could have concluded from case law and from the facts that her position was subject to the political loyalty exception of *Branti–Elrod.* In essence, we believe that the facts on summary judgment, even when viewed in a light most favorable to Garcia–Montoya, reveal a position that is marginal under *Branti.* The unlawfulness in transferring Garcia–Montoya due to political affiliation, assuming it to be unlawful, would not have been apparent in 1995. Under these limited circumstances, we believe Defendants are entitled to qualified immunity. We therefore affirm the district court's grant of Defendants' motion for summary judgment on this claim.

## B. Freedom of Speech

{27} Garcia–Montoya claims that Montoya and Andermann violated her First Amendment right to freedom of speech by transferring her based on the expression of her belief that several of Montoya's personnel actions were politically motivated. "It is well established that a government employer may not discharge an employee for reasons that infringe his or her free-speech interests." *Martinez v. City of Grants,* 1996 NMSC 061, ¶ 15, 122 N.M. 507, 927 P.2d 1045. In this context, we apply a four-part test derived from *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers,* 461 U.S. 138, 142–43, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) to determine whether a public employer has unconstitutionally abridged an employee's freedom of speech: (1) whether the speech forming the basis of the employment action involves a matter of public concern; (2) if so, whether the interests of the employee in speaking on the matter outweigh the interests of the employer in maintaining and promoting efficiency in the performance of its responsibilities to the public; (3) if so, whether the employee is able to show that the speech was a substantial factor in the employment decision; and (4) if so, whether the employer is able to rebut the employee's evidence by showing that it would have instituted the employment action regardless of the protected speech. *See Martinez,* 1996 NMSC 061, ¶ 20, 122 N.M. 507, 927 P.2d 1045; *Barker v. City of Del City,* 215 F.3d 1134, 1138–39 (10th Cir. 2000). The former two factors are questions of law to be decided by the court, while the latter two are issues of fact for the jury. *Martinez,* 1996 NMSC 061, ¶ 20, 122 N.M. 507, 927 P.2d 1045. Applying the first two factors, we believe that Garcia–Montoya's speech involves a matter of public concern and that Defendants have not demonstrated that the balance in this case tips in favor of the employer to restrict the speech. However, as with Garcia–Montoya's political affiliation claim, we conclude that a reasonable official in 1995 could have believed that Garcia Montoya could be transferred on the basis of her speech, and Defendants are therefore entitled to qualified immunity.

### 1. The *Pickering* Balancing Test

{28} In determining whether an employee's speech involves a matter of

public concern, we evaluate "the content, form, and context" of the speech to determine whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146–48, 103 S.Ct. 1684. In this case, we do not believe there is any serious doubt that Garcia–Montoya's speech involved a matter of public concern.

{29} Montoya and Andermann claim that Garcia–Montoya's speech did not involve a matter of public concern because her comments were made in private, because the speech involved internal personnel matters for which Garcia–Montoya was responsible in the STO, and because Garcia–Montoya indicated that she spoke out about the personnel decisions as an employee and not to express herself politically. Defendants claim these facts indicate that Garcia–Montoya "was not assisting the public in its analysis of the performance of the office."

{30} As Defendants point out, it is not determinative in this case that Garcia–Montoya privately communicated her concerns to Montoya and Andermann rather than making her concerns public. In *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 411–13, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), a teacher met privately with the school principal on two occasions to express her belief that the school's employment policies and practices were racially discriminatory. The employer contended that the teacher's remarks were not protected by the First Amendment because they were made in private. The Supreme Court held that "[n]either the Amendment itself nor our decisions indicate that [the freedom of speech] is lost to the public employee who arranges to communicate privately with his [or her] employer rather than to spread his [or her] views before the public." *Id.* at 415–16, 99 S.Ct. 693. Additionally, "[t]he fact that the employee statements were made as a part of the employee's official functions [is] only one of the relevant factors in" the First Amendment analysis. *Koch v. City of Hutchinson*, 847 F.2d 1436, 1442 (10th Cir. 1988).

{31} In *Connick*, an assistant district attorney who was dissatisfied with her employer's plan to transfer her circulated a questionnaire to fellow employees asking their opinion about the "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Connick*, 461 U.S. at 141, 103 S.Ct. 1684. The Supreme Court elaborated on the proper focus of an inquiry into whether speech involves matters of public concern.

> We view [most of] the questions ... as mere extensions of [the employee's] dispute over her transfer to another section.... [W]e do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official.... While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of [the] questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors.

*Connick*, 461 U.S. at 148, 103 S.Ct. 1684.

{32} In this case, it is true that Garcia–Montoya's statements involved matters that could be characterized as part of her official duties relating to personnel. If her statements had only concerned routine matters of personnel, we believe, based on *Connick*, that this case would present a close question. For example, Garcia–Montoya objected to the firing of two employees based on her interpretation of personnel rules without expressing her belief that the terminations were politically motivated. These statements could be interpreted as merely indicating a routine disagreement with personnel action and are therefore similar to the majority of questions posed of coworkers in *Connick* in that, if made public, they "would convey no information at all other than the fact that a single employee is upset with the status quo." *Connick*, 461 U.S. at 148, 103 S.Ct. 1684; *cf. Koch*, 847 F.2d at 1447 (concluding that a matter of public concern was not involved in a "written report [that] was simply one of many routine official reports which are processed through the City's local governmental agencies on a daily basis"). "While as a matter of good judgment, public officials

should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. Thus, if these were the only statements made by Garcia–Montoya, it would be necessary to examine more closely whether Garcia–Montoya's speech implicated the efficiency and effectiveness of the STO during Montoya's term of office. *See Connick*, 461 U.S. at 148 & n. 8, 103 S.Ct. 1684; *Powell v. Basham*, 921 F.2d 165, 167 (8th Cir.1990) (stating that an employee's "criticism of [the employer's] promotion system and practices went beyond his own dissatisfaction and involved concerns expressed by other department employees" and concluding that speech which informs superiors of "the adverse impact the department's promotion practices could have on its operations" and on the efficiency of the office involves matters of public concern).

{33} However, we need not engage in such an analysis because Garcia–Montoya's statements to Montoya and Andermann went well beyond routine personnel matters. Garcia–Montoya expressed her belief to Andermann that he had fired a different employee for political reasons, told Montoya on more than one occasion that she disagreed with the political nature in which he filled various positions, and refused Andermann's request to interview individuals on the ground that she believed they were illegally pre-selected. In *Connick*, while the Court determined that most of the questions posed to the plaintiff's coworkers did not involve matters of public concern, the Court reached a different conclusion with respect to the question of whether the coworkers felt pressured to work on political campaigns for members of the office. *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. The Court determined that the political campaign question implicated "a coercion of belief in violation of fundamental constitutional rights." *Id.* "[T]here is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." *Id.* Like the political campaign question in *Connick*, Garcia–Montoya's speech constituted an expression of belief

that Montoya improperly based his personnel decisions on political affiliation instead of meritorious performance. In effect, Garcia–Montoya was asserting a violation of the First Amendment rights of others and voicing an objection to what she believed was unconstitutional and illegal action by an elected official. Garcia–Montoya therefore sought "to bring to light actual or potential wrongdoing or breach of public trust." *Id.* at 148, 103 S.Ct. 1684. This type of speech is analogous to the complaints about sexual harassment and discrimination in *Martinez* and about racial discrimination in *Givhan* because it involves "a matter inherently of public concern," *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684. *See Martinez*, 1996 NMSC 061, ¶ 27, 122 N.M. 507, 927 P.2d 1045 ("Through ... legislation society has voiced its concern with and condemnation of sexual discrimination and favoritism in the workplace."); *Connick*, 461 U.S. at 146, 103 S.Ct. 1684 ("Although the subject matter of [the plaintiff's] statements were not the issue before the Court [in *Givhan*], it is clear that her statements concerning the School District's allegedly racially discriminatory policies involved a matter of public concern."). The Supreme Court clearly considers it "apparent" that this type of information "is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. As a result, we again find it unnecessary to "decide ... the degree of deference that must be accorded to the employer when the terminated employee's speech addresses only matters of internal office policy." *Martinez*, 1996 NMSC 061, ¶ 31, 122 N.M. 507, 927 P.2d 1045. We conclude that Garcia–Montoya's speech involves matters of public concern.

{34} With respect to the second factor in the four-part test, courts must attempt "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

*See generally Waters v. Churchill*, 511 U.S. 661, 672–75, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). There are a number of factors to consider in performing the *Pickering* balancing, including "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). "The State bears a burden of justifying the discharge on legitimate grounds," *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891, and "the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. 1684. The focus is "on the effective functioning of the public employer's enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. Thus, Montoya and Andermann must "produce evidence of an actual disruption in public services," *Martinez*, 1996 NMSC 061, ¶ 29, 122 N.M. 507, 927 P.2d 1045, or evidence sufficient to support a reasonable belief that the speech would disrupt the department, undermine their authority, or destroy close working relationships in the STO, *see Connick*, 461 U.S. at 154, 103 S.Ct. 1684. *See generally id.* at 152, 103 S.Ct. 1684 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

{35} Because this case involves both the freedom of political belief and the freedom of speech, we note as an initial matter that at least one federal Circuit Court of Appeals has held that the determination that an individual serves in a position subject to political patronage dismissal under *Elrod–Branti* renders the *Pickering* balancing test inapplicable to a Section 1983 claim based on freedom of speech. *See Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994–95 (9th Cir.1999). We do not agree with this approach. The political patronage inquiry under *Elrod–Branti* can involve many of the same considerations that inform the *Pickering* balancing test. Both

analyses take into account the need for loyalty and confidence from a public employee and the extent to which activity protected by the First Amendment affects the performance of a public office. However, the United States Supreme Court has indicated in discussing *Elrod–Branti* that the Court's

> cases call for a different, though related, inquiry where a government employer takes adverse action on account of an employee or service provider's right of free speech. There, we apply the balancing test from [*Pickering* ]. . . . [T]he inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed. A reasonableness analysis will also accommodate those many cases . . . where specific instances of the employee's speech or expression, which require balancing in the *Pickering* context, are intermixed with a political affiliation requirement. In those cases, the balancing *Pickering* mandates will be inevitable.

*O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 719, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).

{36} We believe that the distinction between an *Elrod–Branti* analysis and a *Pickering* balancing lies in the focus of the potential interference with performance; whereas the *Elrod–Branti* analysis focuses generally on the potential detrimental impact of an opposing political affiliation, *Pickering* focuses more specifically on the content, form, place, and manner of the speech at issue and requires a balancing of the importance of the speech with the functioning of the public office. Presumably, even employees holding policymaking positions should be entitled to speak out freely on matters of fundamental social and political importance, such as unlawful discrimination in a public workplace, as long as the manner, time, and place in which the speech is made does not unduly disrupt the functioning of the governmental entity. *See Barker*, 215 F.3d at 1139–40 (reversing the grant of summary judgment in favor of the employer on a claim of

infringement of free speech, despite the employee's status as a policymaker, because, under *Pickering*, "no actual evidence indicates that the City experienced any disruption, that any such disruption was reasonably predicted, or that the City itself had any particular interest in limiting [the] speech"). As a result, we conclude that in cases involving a claim by a public employee of adverse employment action based on both the freedom of political belief and the freedom of speech we must separately address the *Elrod–Branti* analysis and the *Pickering* balancing test. *Barker*, 215 F.3d at 1139 (stating that "the two different analyses remain distinct and separate" and citing other cases following this approach).

{37} In this case, Montoya and Andermann do not contend at this stage that Garcia–Montoya's statements disrupted the office or undermined their authority. Garcia–Montoya made the statements privately to Andermann and Montoya, and there is no indication that the statements affected other employees in the office. *Cf. Rankin*, 483 U.S. at 388–89 & n. 13, 107 S.Ct. 2891 ("[A] purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee."). Additionally, similar to our political affiliation analysis in this case, we believe that Montoya and Andermann have failed to demonstrate sufficient facts to support a close working relationship requiring personal loyalty and confidence, and in any event, they have failed to show that Garcia–Montoya's speech "would seriously undermine the effectiveness of the working relationship between them." *Pickering*, 391 U.S. at 570 n. 3, 88 S.Ct. 1731. Indeed, Garcia–Montoya alleged that Andermann agreed with her on one occasion that a particular personnel decision was politically motivated but lamented that he was carrying out Montoya's instructions. Garcia–Montoya also alleged that Montoya listened to her criticisms, accepted the information, and "took whatever course of action he deemed appropriate." There is some evidence in the record that Garcia–Montoya's speech affected her ability to perform the duties of her position. For example, Garcia–Montoya declined to participate in interviews of applicants she believed were pre-selected on the

basis of political affiliation. However, based on the limited facts provided by Montoya and Andermann and the important interests implicated by Garcia–Montoya's speech, we are unable to conclude as a matter of law that Defendants have carried their burden of justifying the employment action on legitimate grounds. *Cf. Connick*, 461 U.S. at 152, 103 S.Ct. 1684 ("We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."); *Martinez*, 1996 NMSC 061, ¶ 31, 122 N.M. 507, 927 P.2d 1045 (noting that "speech touching upon matters of public concern critical of a supervisor or other members of an office will invariably cause some disruption and that the relevant inquiry in the *Pickering* balance is the degree of disruption in relation to the importance of the speech"). Viewing the facts on summary judgment in a light most favorable to the nonmovant, we conclude that the *Pickering* balance weighs in favor of Garcia–Montoya.

**2. Qualified Immunity**

{38} We believe the district court properly granted summary judgment in favor of Defendants on the ground of qualified immunity for reasons similar to our decision that Defendants are entitled to qualified immunity for the alleged violation of Garcia–Montoya's freedom of political belief. In this opinion, we have rejected the proposition that the determination that a position is subject to political patronage dismissals obviates the need to apply the *Pickering* balancing test. However, this interpretation of *Pickering* and *Elrod–Branti* was not clearly established in 1995. *McEvoy v. Spencer*, 124 F.3d 92, 105 (2d Cir.1997). Thus, a reasonable official in Montoya's or Andermann's position could have concluded that "an employee's policymaking status automatically immunized an employer's adverse action even in a pure *Pickering* case." *Id.* Because we have determined that a reasonable official acting in 1995 could have believed that Garcia–Montoya's position was subject to adverse action based on political patronage, we further determine that a reasonable official acting in 1995 could have believed that adverse employment action against the holder of that

position could constitutionally stem from either political affiliation or instances of speech involving matters of public concern. *Cf. id.* (concluding that officials "did not violate a clearly established right of [the employee] when, reasonably believing that he was a policymaker, they demoted him ... because of speech activities"). As a result, we affirm the summary judgment in favor of Montoya and Andermann on this claim.

## IV. Sex Discrimination under the Human Rights Act

{39} Garcia–Montoya alleged that she was transferred on the basis of her sex in violation of Section 28–1–7(A) of the Human Rights Act. In analyzing claims of unlawful discrimination under the Act, we have found guidance in the federal courts' interpretation of unlawful discrimination under Title VII, 42 U.S.C. § 2000e–2 (1994). *See Smith v. FDC Corp.*, 109 N.M. 514, 517, 787 P.2d 433, 436 (1990) ("Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own."). In particular, we have applied the evidentiary methodology articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this methodology, "a plaintiff bears the initial burden of establishing a prima facie case; once the prima facie case is established, the employer bears the burden of producing evidence of a legitimate, nondiscriminatory reason for its action; and finally, a plaintiff must be afforded an opportunity to rebut the employer's proffered reason." *Gonzales v. N.M. Dep't of Health*, 2000 NMSC 029, ¶ 21, 129 N.M. 586, 11 P.3d 550. One method of establishing a prima facie case under *McDonnell Douglas* is for a plaintiff to show that he or she "is a member of [a] protected group, that he [or she] was qualified to continue in his [or her] position," that the employer removed him or her from the position, and "that his [or her] position was filled by someone not a member of the protected class." *Smith*, 109 N.M. at 518, 787 P.2d at 437 (noting that "[a] prima facie case may also be made out through other means"). If a plaintiff establishes a prima facie case, there is "a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). However, the presumption "drops from the case" if the defendant satisfies the burden of producing evidence of a legitimate, nondiscriminatory reason for the employment action. *Id.* at 255 & n. 10, 101 S.Ct. 1089. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. 1089.

{40} In this case, the STO produced evidence of a legitimate, nondiscriminatory reason for its action. Specifically, the STO claimed that it transferred Garcia–Montoya based on the Table of Organizational Listings (TOOL), a document describing the organizational structure of the agency. According to the STO, Garcia–Montoya's TOOL number placed her within the investment division of the agency rather than the administrative services division. As a result, the STO claimed that it was necessary to reassign Garcia–Montoya to the proper division. Additionally, the STO asserted that Garcia Montoya was reassigned to the position of acting director of the local government investment pool in order to oversee a program that was expanding due to new legislative mandates. In response to these claims, Garcia–Montoya introduced evidence suggesting that the STO's proffered reason was false. She stated in an affidavit that her State employment classification was not inconsistent with her former position and that administrative services was merely a subunit of a different division in the STO during Montoya's term of office. Garcia–Montoya also claimed that Montoya made numerous personnel decisions from January 1995 through September 1995 without regard to the TOOL and, even more specifically, that her replacement did not have the correct TOOL for the director of administrative services position. Despite Garcia–Montoya's contention that the proffered reason was false, the STO argued to the district court that it was entitled to judgment as a matter of law based on *St.*

*Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[3]

{41} In *St. Mary's,* the United States Supreme Court elaborated on the burden-shifting methodology of *McDonnell Douglas* . The plaintiff in *St. Mary's* established a prima facie case under *McDonnell Douglas,* and the employer then introduced evidence "of two legitimate, nondiscriminatory reasons for their actions: the severity and the accumulation of rules violations committed by" the plaintiff. *Id.* at 506–07, 113 S.Ct. 2742. However, based on a showing by the plaintiff, the trial court found at the close of a bench trial that the employer's proffered reasons "were not the real reasons for [the plaintiff's] demotion and discharge" because other employees in equivalent positions were not disciplined for committing similar or even more severe rules violations. *Id.* at 508, 113 S.Ct. 2742. Despite the trial court's rejection of the employer's proffered reason, the trial court found that the plaintiff "failed to carry his ultimate burden of proving that *his race* was the determining factor in [the] decision first to demote and then to dismiss him," and entered judgment in favor of the employer. *Id.* The Eighth Circuit Court of Appeals reversed and held that proof that an employer's proffered reason is false entitles the plaintiff in a discrimination case to judgment as a matter of law. *Id.*

{42} The Supreme Court reversed and determined that the Eighth Circuit's interpretation of the *McDonnell Douglas* test would effectively "substitute . . . the required finding that the employer's action was the product of unlawful discrimination [with] the much different (and much lesser) finding that the employer's explanation of its action was not believable." *Id.* at 514–15, 113 S.Ct. 2742. "[T]he Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff . . . ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.' " *Id.* at 511, 113 S.Ct. 2742.

{43} The STO argues that Garcia Montoya's claim fails as a matter of law because, once the STO satisfied its burden of production, she did not introduce any additional evidence of discrimination beyond the evidence discrediting the STO's proffered reason for the employment action. The STO's argument is likely based on the Supreme Court's statement that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's,* 509 U.S. at 515, 113 S.Ct. 2742. In fact, a number of federal Courts of Appeals interpreted *St. Mary's* in accordance with the STO's position. *See generally Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2104–05, 147 L.Ed.2d 105 (2000) (noting a conflict among the federal courts and listing cases). In granting the STO's motion for summary judgment, it appears that the district court accepted this construction of *St. Mary's* and determined that Garcia–Montoya's failure to introduce additional evidence of discrimination was fatal to her claim.

{44} Since the district court's ruling, the United States Supreme Court has specifically addressed the issue raised in the STO's motion for summary judgment and has resolved the conflicting applications of *St. Mary's* by the federal Courts of Appeals. In *Reeves,* the Supreme Court clarified "the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence." 120 S.Ct. at 2108. The Court reviewed its decision in *St. Mary's* and determined that, under the holding of that case, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from

---

3. By focusing on *St. Mary's,* the STO appears to have accepted that Garcia–Montoya established her prima facie case under *McDonnell Douglas.* Indeed, Garcia–Montoya introduced evidence that, as a female, she is a member of a protected class, that she was transferred from her position, and that the position was filled by a male. Additionally, Garcia–Montoya alleged that the male who replaced her received greater compensation in the position than she did, and she raised a genuine issue of material fact as to whether she was qualified for the position of director of administrative services. Although the STO disputed several of Garcia–Montoya's allegations, Garcia–Montoya introduced sufficient evidence to create a question of fact for the jury with respect to her prima facie case. *See St. Mary's,* 509 U.S. at 509–10, 113 S.Ct. 2742.

the falsity of the employer's explanation." *Reeves*, 120 S.Ct. at 2108.

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it might be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.* at 2108–09 (citations, quotation marks, and quoted authority omitted).

■ {45} The Court's opinion in *Reeves* clarifies that, to avoid an adverse judgment as a matter of law, the plaintiff ordinarily need not introduce additional evidence of discrimination beyond evidence establishing a prima facie case and evidence of the falsity of the proffered reason for the employment action. The Court therefore rejected the interpretation of *St. Mary's* offered by the STO in this case. We believe the Supreme Court's interpretation of Title VII in *Reeves* is in accord with the intent of the Legislature with respect to Section 28–1–7(A). *See Smith*, 109 N.M. at 518, 787 P.2d at 437 ("[T]he purpose of the [*McDonnell Douglas* ] test is to allow discriminated-against plaintiffs, in the *absence* of direct proof of discrimination, to demonstrate an employer's discriminatory motives.").

{46} It appears that the district court, not having the benefit of the Supreme Court's opinion in *Reeves*, based its ruling on the STO's mistaken interpretation of the law. As a result, we believe it is prudent to vacate the grant of summary judgment in favor of

the STO. We do not conclude, however, that the district court's ruling was necessarily erroneous. The Supreme Court also explained in *Reeves* that its interpretation of *St. Mary's* does not mean that evidence establishing a prima facie case and the falsity of the employer's proffered reason

> will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 120 S.Ct. at 2109.

{47} In this case, we believe that Garcia–Montoya created more than just a "weak issue of fact" concerning the falsity of the STO's proffered reason. Garcia–Montoya's evidence, if believed by a factfinder, suggests that the STO may have been "dissembling to cover up" its true motive in transferring her. However, the record also suggests that, if the STO's proffered reason was false, the STO may have been concealing a motive other than discrimination on the basis of sex. Almost all of the material submitted by Garcia–Montoya on summary judgment focuses on political affiliation as the motivation for her transfer. Indeed, Garcia–Montoya averred that Montoya told her directly that he transferred her because he did not "trust any of you," which she interpreted as a comment about political affiliation. Additionally, Garcia–Montoya alleged that her replacement was a political ally of Montoya. Based on this evidence, it may be that the STO asserted a false justification for Garcia–Montoya's transfer in order to obscure a decision based on political affiliation.[4]

---

4. Even if Defendant Montoya intended to transfer Garcia–Montoya based on political affiliation,

his subjective intent would not change our conclusions with respect to Garcia–Montoya's Sec-

{48} Nonetheless, rather than this Court addressing the issue in the first instance, we believe it is more appropriate in this case to allow the district court to consider initially whether the record "conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision" and, if necessary, to permit the parties to develop more fully the facts relevant to the legal analysis established in *Reeves*. "[O]n appeal, when the trial court's grant of summary judgment is grounded upon an error of law, the case may be remanded so that the issues may be determined under the correct principles of law." *Rummel v. Lexington Ins. Co.*, 1997 NMSC 041, ¶ 16, 123 N.M. 752, 945 P.2d 970. Accordingly, we vacate the grant of summary judgment in favor of the STO and remand for reconsideration of the motion based on *Reeves*.

## V. Immunity under the Tort Claims Act

{49} With respect to Garcia–Montoya's claims of intentional infliction of emotional distress and defamation, the district court granted Defendants' motion for summary judgment on the basis that Garcia–Montoya's claims were barred by the Tort Claims Act. Under the Tort Claims Act, "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived" by the provisions of the Act. Section 41-4-4(A). Garcia–Montoya claims that summary judgment was improper because Montoya and Andermann were not acting within the scope of duty. Garcia–Montoya contends simply that intentional torts are outside the scope of duties for the positions of State Treasurer and Deputy State Treasurer. Certainly, Garcia–Montoya's position oversimplifies the issue. Public employees are not directed to commit torts as a part of their official duties; thus, Garcia–Montoya's formulation of the scope of duty test would completely nullify the Legislature's intent to provide governmental immunity against tort claims. *See* NMSA 1978, § 41-4-2(A) (1976) ("[T]he area within which

the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.").

{50} The Legislature has specifically defined "scope of duties" to "mean[ ] performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time and place of performance." NMSA 1978, § 41-4-3(G) (1995). Garcia–Montoya fails to specify any actions by Montoya and Andermann which they were not requested, required, or authorized to perform. As a result, we do not believe that Garcia–Montoya has raised a genuine issue of material fact that Montoya's and Andermann's actions were outside the scope of their duties, and we affirm the summary judgment in Defendants' favor.

## VI. Conclusion

{51} With respect to Garcia–Montoya's Section 1983 claims, we conclude that Montoya and Andermann are entitled to qualified immunity and therefore affirm the grant of summary judgment in their favor. We also affirm the grant of summary judgment in favor of Montoya and Andermann on Garcia–Montoya's tort claims based on immunity under the Tort Claims Act. We remand for reconsideration of the STO's motion for summary judgment on Garcia–Montoya's claim of unlawful discrimination based on a clarification of the legal standard applicable to a plaintiff's burden of proving discrimination through indirect evidence.

{52} **IT IS SO ORDERED.**

BACA and FRANCHINI, JJ., concur.

MINZNER, J., concurs in part and dissents in part.

MINZNER, Justice (concurring in part and dissenting in part).

{53} I concur in part and dissent in part. I concur in the First Amendment analysis,

tion 1983 claims. *See Crawford–El v. Britton*, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (stating that "[e]vidence concerning the defendant's subjective intent is simply irrelevant to [the] defense" of qualified immunity); *see also Sanders*, 1999 NMCA 079, ¶ 24, 127 N.M. 465, 982 P.2d 1064.

sex discrimination analysis, and Torts Claims Act analysis. I dissent in part, however, because I believe the district court erred by granting summary judgment in favor of Montoya and Andermann on the issue of qualified immunity with respect to Garcia–Montoya's First Amendment claims.[1]

{54} We review grants of summary judgment de novo, asking whether there is a genuine issue of material fact and whether the movant was entitled to judgment as a matter of law. *See Phoenix Indemnity Ins. Co. v. Pulis*, 2000 NMSC 023, ¶ 6, 129 N.M. 395, 9 P.3d 639. We use a two-part test to determine whether qualified immunity shields officials from individual liability under Section 1983. First, we ask "whether the official's alleged conduct violated a constitutional ... right." *Kennedy v. Dexter Consolidated Schools*, 2000 NMSC 025, ¶ 10, 129 N.M. 436, 10 P.3d 115; *see Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). I agree that there is a genuine issue of material fact as to whether Montoya and Andermann violated Garcia Montoya's First Amendment rights. *See* Majority Opinion, ¶ 23.

{55} The next inquiry is whether the constitutional "right was clearly established at the time of the alleged conduct." *Kennedy*, 2000 NMSC 025, ¶ 10, 129 N.M. 436, 10 P.3d 115; *see Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official understands that what he [or she] is doing violates that right.' " *Kennedy*, 2000 NMSC 025, ¶ 10 129 N.M. 436, 10 P.3d 115 (quoting *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034). Whether the official conduct violates a clearly established right "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034; *see Kennedy*, 2000 NMSC 025, ¶ 14, 129 N.M. 436, 10 P.3d 115.

{56} The level of generality used to define the right reflects a balancing of competing interests. The purposes of Section 1983,

fully compensating victims of constitutional torts and protecting individual liberties by deterring future constitutional violations, are balanced against "the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson*, 483 U.S. at 638, 107 S.Ct. 3034. Accordingly, the right must not be defined so generally that it converts qualified immunity into "virtually unqualified liability." *Id.* at 639, 107 S.Ct. 3034. However, relying on *Anderson*, this Court recently emphasized that we should not "requir[e] too specific a correlation between the misconduct and the established law." *Kennedy*, 2000 NMSC 025, ¶ 13, 129 N.M. 436, 10 P.3d 115. The requirement that the right be clearly established does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. Instead, the test is whether, under the law that existed at the time, a reasonable official would have understood that his or her conduct was unconstitutional. *See id.*

{57} In order to determine whether Montoya and Andermann are immune from liability with respect to Garcia–Montoya's First Amendment claims, it is necessary to determine, at the proper level of generality, what Garcia–Montoya's clearly established First Amendment rights were in 1995. As a general rule, the First Amendment prohibits political patronage in the context of public employment; it is generally unconstitutional to dismiss, demote, or transfer a public employee based on political affiliation or belief. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion). However, there is an exception to the general rule; it is constitutionally permissible to use political affiliation or belief as the basis for

1. The majority holds that Montoya and Andermann enjoy qualified immunity with respect to all of Garcia–Montoya's First Amendment claims. The holding that the individual defendants are qualifiedly immune with respect to the

free speech claim depends on its holding regarding the freedom of association claim. Because I do not join the holding on the freedom of association claim, I also dissent with respect to the free speech claim.

dismissing, demoting, or transferring public employees who occupy "policymaking positions." *Elrod,* 427 U.S. at 367, 96 S.Ct. 2673. This exception only applies if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. 1287. Only "certain *high-level* employees" are subject to the exception. *Rutan,* 497 U.S. at 74, 110 S.Ct. 2729 (emphasis added). The exception is "narrow," *Burns v. County of Cambria,* 971 F.2d 1015, 1023 (3d Cir. 1992); *see Elrod,* 427 U.S. at 368, 96 S.Ct. 2673, and "doubt should be resolved in favor of the public employee," *Dickeson v. Quarberg,* 844 F.2d 1435, 1442 (10th Cir.1988).

{58} Cases decided prior to September of 1995 would not lead a reasonable official to conclude that Garcia–Montoya's position fell within the policymaking, or *Elrod–Branti,* exception. A public official who occupies a position that requires communication with the public, the press, and policymaking government bodies may be subject to the *Elrod–Branti* exception. *See Branti,* 445 U.S. at 518, 100 S.Ct. 1287. Garcia–Montoya did not serve any such role. *See* Majority Opinion, ¶ 22. In addition, the exception applies to "employee[s] with responsibilities that are not well defined or are of broad scope." *Elrod,* 427 U.S. at 368, 96 S.Ct. 2673. Garcia–Montoya's responsibilities were well defined and not of such broad scope that particular political affiliations or beliefs were necessary for her to perform her duties effectively.

{59} The Court concludes that it was not clear in September of 1995 whether the *Elrod–Branti* exception applied to Garcia–Montoya because of her involvement in personnel and budgetary matters. *See* Majority Opinion, ¶ 26. According to the majority, the right to freedom of political belief and association was not defined clearly enough in this context. The Court states "that the contours of the right are generally well-defined and that reasonable officials in the majority of cases will be aware of a violation of the freedom of political belief," Majority Opinion, ¶ 25, but concludes that "with respect to the position involved in this case, we believe that the contours of the right are not sufficiently

clear that a reasonable official would understand that what he [or she] is doing violates that right," *id.,* ¶ 26 (internal quotation marks and quoted authority omitted).

{60} I think the Court requires too much specificity in this case. Qualified immunity does not shield individual defendants whenever the right has not been defined precisely under the exact facts in question. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. There may not have been any case decided prior to September of 1995 that was perfectly, or even very closely, analogous to this case, but the law was clear enough to allow a reasonable official to conclude that transferring Garcia–Montoya based on her political affiliation would violate her constitutional rights. The result of defining the right too specifically, as the majority has, is overly-expansive immunity for constitutional tortfeasors. *Anderson* and *Kennedy* warn against this, instructing us to define the right at an intermediate level of generality in order to strike a balance between the competing interests. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *Kennedy,* 2000 NMSC 025, ¶ 13, 129 N.M. 436, 10 P.3d 115.

{61} Garcia–Montoya's right not to be transferred based on her political associations was clearly established in September of 1995 despite her involvement in personnel and budgetary matters. Although involvement in budgetary matters may weigh in favor of finding that an employee is subject to the *Elrod–Branti* exception, Garcia–Montoya's involvement in implementing the budget of the State Treasurer's Office was not extensive enough to subject her to that exception. Cases decided before September of 1995 holding that a position falls within the exception based on involvement in budgetary matters seem to require a higher level of involvement and to rely on additional facts in reaching the conclusion that political affiliation or loyalty "is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. 1287. I think the precedent in September of 1995 would have led a reasonable official to believe that an employee's limited involvement in implementing a budget is insufficient constitutional justification

for a transfer based on political affiliation or belief.

{62} For example, in *Peters v. Delaware River Port Authority of Pennsylvania and New Jersey,* 16 F.3d 1346 (3rd Cir.1994), the court listed involvement in the *preparation* of a budget as one of several factors supporting its holding that the Secretary of the Delaware River Port Authority (DRPA) was subject to the *Elrod–Branti* exception. Garcia–Montoya had a more limited role in budgetary matters than the Secretary in *Peters;* political affiliation is more relevant to budget preparation than to budget implementation. Moreover, unlike Garcia–Montoya, the Secretary in *Peters* had many other duties that made party affiliation an appropriate requirement for the position he held. The Secretary was "assigned sensitive and important responsibilities on a variety of important policy matters." *Id.* at 1359. His duties included "participating in high-level DRPA matters" with other government agencies and bodies, "participating in all policy-forming discussions during executive sessions of the DRPA," "acting as liaison and maintaining good public relations with other agencies," "interpreting and executing DRPA policy," and recommending significant changes in the DRPA's organizational structure. *Id.* at 1358–59. It seems to me that *Peters* would not lead a reasonable official to believe that merely being involved in budgetary matters brings an official within the *Elrod–Branti* exception. On the contrary, based on *Peters,* a reasonable official would conclude that a high level of involvement in budgetary matters or additional policymaking duties are required for the *Elrod–Branti* exception to apply. This case presents neither scenario.

{63} Similarly, based on the cases decided before September of 1995, a reasonable official would not believe that Garcia–Montoya's involvement in personnel matters subjected her to the *Elrod–Branti* exception. The majority recognizes that political affiliation was not relevant to many of Garcia–Montoya's duties but concludes that it might be relevant to her limited involvement in personnel matters. *See* Majority Opinion, ¶¶ 18–22, 26. However, it was clear in 1995 that involvement in personnel matters does

not subject an otherwise protected position to political patronage. *See Dickeson,* 844 F.2d at 1443–44 (holding that an official who supervised other employees was not subject to the *Elrod–Branti* exception). In 1995 there was nothing in the case law suggesting that a public employee's political beliefs or affiliations would adversely affect that employee's ability to perform limited duties in the area of personnel such as handling paperwork and advising a superior about adding new positions that might benefit the office.

{64} I think it would have been clear to a reasonable official in 1995 that particular political beliefs and associations were not necessary for the effective performance of Garcia–Montoya's duties as Deputy Director of Administrative Services for the State Treasurer's Office. It was clear in 1995 that Garcia–Montoya did not have broad power with respect to partisan political issues and was therefore "not in a position to thwart the goals of the in-party." *Elrod,* 427 U.S. at 367, 96 S.Ct. 2673.

{65} For these reasons, I disagree with the Court's conclusion that Montoya and Andermann enjoy qualified immunity with respect to Garcia–Montoya's First Amendment claims and would reverse on this point and remand for trial. Accordingly, I respectfully concur in part and dissent in part.